BAIRD, Respondent, v. CORNELIUS and others, Appellants.*

*November 30, 1960—January 10, 1961.*

* Motion for rehearing denied, with $25 costs, on March 7, 1961.

For the appellants Orville D. Cornelius and Employers Casualty Company there was a brief by *Flatley, Galloway & Olson* of Green Bay, and oral argument by *Robert H. Flatley.*

For the appellants Dick Brothers, John R. Handlen, and Yorkshire Indemnity Company there were briefs by *Kaftan, Kaftan & Kaftan* of Green Bay, and oral argument by *Fred F. Kaftan.*

For the respondent there was a brief by *Burns & Lubinski* of Seymour, and oral argument by *Michael Burns.*

DIETERICH, J. The two appeals present the following issues:

1. Assumption of risk on the part of plaintiff, Joseph Baird, as a matter of law.

2. Contributory negligence on the part of the plaintiff passenger and guest, Joseph Baird.

3. Whether the emergency doctrine applies as to John R. Handlen.

4. Absence of causal negligence as to lookout on the part of defendant, John R. Handlen.

*Assumption of Risk and Contributory Negligence.*

The defendants-appellants contend that the plaintiff assumed the risk of injury upon the assumption that Cornelius and Baird were intoxicated as a matter of law. They further contend that the court failed to instruct the jury as to the legal effect of certain blood tests in accordance with sec. 325.235, Stats. It is also contended that the plaintiff Baird was guilty of contributory negligence as a matter of law, and the court should have included a question in the special verdict inquiring as to the contributory negligence on the part of the plaintiff.

The testimony of Joseph Baird reveals that he was forty-five years of age, that he knew Cornelius for at least ten years, and with the exception of the day of the accident had never been a passenger in the Cornelius car other than driving back and forth from their place of employment at the Weisler Construction Company in Appleton, Wisconsin. He further testified, "I got up about a quarter to 8 in the morning and had breakfast with my mother who had prepared it. After breakfast I stayed home until 9 o'clock that morning when I walked down to the Episcopal Church. I had nothing to drink at home in the way of beer or liquor that morning before I went to the Episcopal Church because we didn't have anything. I left at 9. The church is about one mile north of my house toward Oneida. The purpose of going was to have the janitor cut my hair. His name is Elmer Wheelock. He cut my hair that morning; I got to the Episcopal Mission about 9:30. I left a little after 10 and went to the White Eagle Tavern, not quite a quarter of a mile from there, toward Oneida on Highway 54 and arrived at the White

Eagle Tavern about 10 after or a quarter after 10. I went to the south end of the bar to my right as I walked in. There were other people at the other end of the bar whom I don't remember. I got two beers at the White Eagle Tavern and ordered one as soon as I got my cigarettes, about eight-ounce glasses. About ten minutes after I was there Mr. Cornelius came there. I had not seen him earlier that day. He went to the other end of the bar and talked to these people and then came over by me for a couple of minutes. Then he said 'Let's go up and take a ride up to Oneida.' He said he wanted to see Herman Denny. I didn't see Mr. Cornelius take anything to drink at the White Eagle Tavern while he was visiting me. I didn't pay too much attention as to whether he had anything to drink while he was at the other end of the bar. Mr. Cornelius was in the White Eagle Tavern not more than ten minutes. I don't think I was in the White Eagle Tavern much more than twenty minutes and Mr. Cornelius was in there about one half that time. Mr. Cornelius had no beer that I observed and I didn't see him drink anything while visiting the other people. When we left the White Eagle he drove his car, a 1957 Plymouth four-door sedan. When we got to Oneida he drove into Bunker's Tavern. We came in the back door. There was nothing unusual about the manner in which Cornelius operated his car as he left the White Eagle Tavern. He parked his car and we walked into the tavern. We arrived about 10:30. I ordered a glass of beer and asked Mr. Cornelius if he cared for anything to drink and he said 'No.' Mr. Cornelius did not drink anything at the Bunker Tavern that morning while I was there and he was in the tavern all the time I was. I don't think we stayed at the Bunker Tavern more than five minutes and I had no more than one eight-ounce glass of beer. He said 'Let's take a ride toward Seymour.' We left the tavern. He had to complete his circle around the tavern, and where the village street intersects or meets Highway 54 there is a stop sign where Mr. Cornelius stopped his car. He had no difficulty making

that turn and driving around the tavern to get to Highway 54. After we stopped at the stop sign, he continued on Highway 54 without stopping until we got to Rettmann's Tavern about five miles south of Oneida. The front of the Rettmann building faces south and the tavern entrance is in the center of the east side of the building. We got out of the car and walked into the tavern. We both went to the men's room. I left the men's room first, walked to the bar, ordered two more glasses of beer. Mr. Rettmann was tending bar. As Orville came out of the men's rest room, he said 'Let's go.' I offered to pay for the two glasses of beer because he didn't want to drink anything there. The tavernkeeper said, 'Never mind.' We were not in the tavern more than two or three minutes. We left and then got into the car. Orville was behind the wheel and I to his right in the front seat. As we were approaching the highway I was looking to my right which was west. I would say the Cornelius car had to travel from its position after he had backed and straightened out to the north edge of 54 somewhere in the neighborhood of 80 feet. When we got past the east side of the building, I glanced to my right and made an observation to see whether or not there were any cars approaching from my right on Highway 54. There were none. Mr. Cornelius did not ask me to look. I generally look to see if anything is coming to my right side of the car. As the car was leaving the Rettmann property and approaching the highway, it could not have traveled more than five miles an hour. It did not stop at any time after it started up when it was straightened out, and before it entered onto the highway, because we just slowed down. After we got beyond the side of the building I looked to my right and saw nothing, I did not look in any other direction before this collision occurred. When I first saw the bakery truck, the Cornelius car was already making the turn, we were on the highway across the center line, the front end of the car was already across the center line facing east. When I first saw the truck it must have been right there because I just seen

the front and that is the last I remember. I have no recollection of what happened immediately after the impact."

Orville Cornelius testified as follows: "I am thirty-one years of age. I arose on August 2d about 7 or 7:30, went to Andy's Bar and had three or four bottles of beer. I went to Joseph Baird's house and found him drinking canned beer with his brother, Edwin. I had a can of beer with them. Joseph Baird and I went to the White Eagle Tavern, arriving there between 9:30 and 10. We stayed at the White Eagle Tavern, having a few beers, for twenty or twenty-five minutes. I do not know how many beers we had there. We then went to Bunker's Tavern. I do not know how many we had at that tavern. We then went to Rettmann's Tavern where we had one glass of beer. I do not know if Joseph Baird was intoxicated, but I think he had some beer, the way he looked to me. We left Rettmann's about 11. I was driving and Joseph Baird was in the right front seat. We started up slow, backed up to the east to clear the tavern and started south toward the highway. I looked to the east and saw nothing coming. The sun was too bright and I didn't see the truck. I had asked Joseph Baird to look to the west to see if anything was coming. He said there wasn't anything coming. My car was entirely south of the center line of the highway at that time, and my car was facing east at the moment of impact. I could not say anything about the speed of the truck. I had no difficulty driving my car. I think the reason I did not see the Dick Brothers Bakery truck was because of the sun in my eyes. It was not Baird's and my practice to pal around together."

John Handlen testified that his speed immediately before the accident was 50 miles per hour and that he first noticed the Cornelius car when it was in the driveway leading into Highway 54 and his car was about 300 feet away. He estimated the speed of the Cornelius car at eight to 10 miles per

hour. Handlen testified that he did not swing to the right instead of the left because he would have hit him square. The Cornelius car was at the time of the collision about five to eight feet across the center line of the highway.

The testimony of Grace Bunker, who operates Bunker's Tavern with her husband, is that Baird and Cornelius came into their tavern on August 2, 1958. Baird had part of a glass of beer. Cornelius had nothing to drink. They stayed about three minutes. There was nothing to indicate that either one was under the influence of liquor.

The claim of intoxication of Cornelius and Baird is founded almost in its entirety upon blood alcohol tests made at the hospital to which Cornelius and Baird had been taken after the accident.

The testimony of Dr. Vernon Hittner, called as a witness for Baird, is that he came into the emergency room right after Baird was admitted to the hospital and that he was with him for forty minutes. That he did not notice any odor of beer or any other intoxicants on Mr. Baird and had no recollection of ordering blood test made as to the alcoholic content of Baird's blood, and that his records show no such order made by him, and further that he had no reason to order such blood test taken. Dr. Hittner further testified that Baird on entry to the hospital was semicomatose. He had a severe laceration on the left side of his chest, bruises on his chest, right lower chest, and left side of his abdomen, and right leg fractured.

The trial court admitted into evidence the various hospital records as to Baird and Cornelius as well as the blood-test results. However, there was conflicting testimony as to whether the blood samples taken were those of Baird. Dr. Hittner testified he had not ordered any taken. Sister Mary Leo testified that she was merely the custodian of the laboratory records and findings on blood samples. Harold Glick-

man, medical technologist at St. Vincent's Hospital, testified for the defendant, as to the blood test and sample of Cornelius made on August 4, 1958. He stated that the Cornelius blood sample was labeled with Dr. Groendahl's name on it and the result of that test shows .210 grams per cent of alcohol.

Dr. Raymond C. Groendahl testified for defendant Cornelius. He stated that he arrived at the scene of the accident and accompanied the ambulance to the hospital. He testified that his final diagnoses of Cornelius at St. Vincent Hospital were: "1. Acute alcoholic intoxication; 2. lacerations of the head; and 3. cerebral contusion." He stated further that Cornelius had an odor resembling alcohol on his breath and that he ordered the blood test on him.

Dr. George French testified on behalf of the defendants as an expert upon the significance of a finding of alcoholic blood determination. In testifying he stated that a specimen analyzed by a medical technician and found to have a .21 alcoholic content within a reasonable time of an accident, he would definitely be of the opinion he was under the influence of alcohol. He later modified his statement to the effect that an individual can build up a tolerance to alcohol by reason of consuming substantial amounts of alcohol over a period of time, days and years.

The testimony of Elmer Wheelock, janitor at the Episcopal Mission, is that Joseph Baird came to the church the morning of the accident to get a haircut about 9 or 9:30. He gave him a haircut. He noticed no odor of liquor or beer on Baird. The plaintiff did not appear to be under the influence of intoxicating liquor.

Sec. 325.235, Stats., provides:

"CHEMICAL TESTS FOR INTOXICATION. (1) In any action or proceeding in which it is material to prove that a person was under the influence of an intoxicant while operating or handling a vehicle or firearm, evidence of the amount

of alcohol in such person's blood at the time in question as shown by chemical analysis of a sample of his breath, blood, urine, or saliva is admissible on the issue of whether he was under the influence of an intoxicant if such sample was taken within two hours after the event to be proved. Such chemical analysis shall be given effect as follows without requiring any expert testimony as to its effect: . . .

"(4) The provisions of this section relating to the admissibility of chemical tests for intoxication shall not be construed as limiting the introduction of any other competent evidence bearing on the question of whether or not a person was under the influence of an intoxicant."

This statute specifically provides that blood tests have certain evidentiary materiality. However, they are not in and of themselves conclusive. Such tests constitute certain elements of proof to be weighed with other facts and circumstances by the jury in determining whether intoxication existed, and whether it was sufficient to have the effect of minimizing the abilities of Cornelius and Baird to exercise due care as to the management of the Cornelius car in which they were riding or for their own safety. The testimony and facts in this case presented a jury issue as to the intoxication of Cornelius and Baird, which could not be resolved by the trial court as a matter of law. The lack of corroborating evidence of intoxication made it a typical jury issue.

The trial court found Orville Cornelius causally negligent as to lookout, failing to yield the right of way, and failure to grant the right of way to Handlen as a matter of law.

The special verdict contained the following questions with reference to the negligence of Orville Cornelius:

"1. Just before the collision in question was the defendant, Orville Cornelius, negligent in any of the following respects:

"(a) As to lookout? Answer: Yes. (Answered by the Court.)

"(b) Did he fail to grant the right of way to the Handlen truck? Answer: Yes. (Answered by the Court.)

"2. Was such negligence on the part of the defendant, Orville Cornelius, a cause of the collision in question:

"(a) With respect to lookout? Answer: Yes. (Answered by the Court.)

"(b) With respect to failure to grant the right of way to the Handlen truck? Answer: Yes. (Answered by the Court.)"

The trial court submitted the following questions in the special verdict as to Baird's contributory negligence and assumption of risk:

"5. Just before the collision in question was the plaintiff, Joseph Baird, negligent as to lookout? Answer: No.

"8. Did the plaintiff, Joseph Baird, assume the risk of the causal negligence of Orville Cornelius in either or both of the following respects:

"(a) As to his lookout? Answer: No.

"(b) With respect to his failure to grant the right of way to the Handlen truck? Answer: No."

The jury found Handlen causally negligent as to lookout and control.

The jury apportioned the damages at 80 per cent to Orville Cornelius and 20 per cent to John Handlen.

The trial court gave the following instruction to the jury as to Baird's assumption of risk and contributory negligence:

"You are instructed that the drinking of intoxicants by him had no material bearing on this question, and should not be considered by you in deciding it unless you first find that the amount consumed had so far affected him as to lessen or impair, to an appreciable degree, his ability to exercise ordinary care for his own safety. If you so find, then you are instructed that his drinking gave him no excuse for any failure to measure up to the standard of ordinary care that you may further find occurred. A guest passenger who indulges in intoxicants is held to the same standard of ordinary care for his own self-protection as one who has not so indulged. . . .

"In considering the question which pertains to assumption of risk, you are instructed that voluntary indulgence in intoxicants by a guest, such as the plaintiff was, does not lessen or

relax the requirements which the law imposes concerning protest or conduct or action to preserve himself or protect himself against negligent conduct on the part of the driver—as to which you have already been instructed—and he is held to the same duty in that respect as one who has not so indulged. . . .

"Evidence has been received in this case of the drinking of intoxicants by the defendant, Orville Cornelius, before the collision. You are instructed that the drinking of intoxicants by him has no material bearing on this question of assumption of risk on the part of Joseph Baird unless you first find that the amount of intoxicants consumed by Orville Cornelius had so far affected him as to lessen or impair to an appreciable degree his ability to exercise ordinary care in the operation of his automobile or in maintaining a proper lookout or in granting or yielding the right of way. If you find, however, that his indulgence in intoxicants had the effect of affecting his ability to exercise ordinary care in the operation of his automobile, including his lookout and his duty to yield the right of way, then you can consider the drinking done by Orville Cornelius, as well as other facts and circumstances material, as disclosed by the evidence, bearing on the inquiry as to whether Mr. Baird assumed the risk.

"If you find that the drinking done by Mr. Cornelius had the effect of appreciably lessening or impairing his ability to exercise ordinary care in the operation of his motor vehicle, and further find that Joseph Baird knew of it, or in the exercise of ordinary care should have known of it—that Mr. Cornelius' drinking was likely to have such effect—then you must find that Mr. Baird assumed the risk, and you will answer this question 'Yes.'

"Conversely, if you find either that Mr. Cornelius had not drunk to the extent that his ability to exercise ordinary care had been appreciably affected, or if you find that he did, and that Mr. Baird did not know of it or could not in the exercise of ordinary care have discovered it, then, of course, you may find that there was not assumption of risk."

The question submitted by the trial court made Baird's conduct the subject of two inquiries, contributory negligence and assumption of risk, and its instructions in connection therewith adequately and properly covered all of the essential

facts so that a determination could be made by the jury as to contributory negligence and assumption of risk.

The record in this case fails to support the appellants' contention that the facts herein established constitute a drinking-party case.

It is apparent from the record that the jury of 12 resolved this drinking and intoxication question. There is credible evidence in the record, together with reasonable inferences which could be drawn therefrom, to support the jury's findings and under such circumstances neither the trial court nor this court will disturb the findings of the jury. See the following authorities as to drinking-party cases involving the question of assumption of risk by a guest passenger: *Frey v. Dick* (1956), 273 Wis. 1, 76 N. W. (2d) 716; *Topel v. Correz* (1958), 3 Wis. (2d) 495, 89 N. W. (2d) 295; and *Diedrich v. Lukasavitz* (1959), 6 Wis. (2d) 466, 95 N. W. (2d) 267.

### *Emergency Rule.*

The jury found John Handlen causally negligent as to lookout and control. It is contended that Handlen is entitled to the benefit of the emergency rule and therefore should be fully exonerated.

There are at least two burdens which Handlen must carry before the emergency rule is available to him. (1) That an emergency developed so suddenly and unexpectedly that there was no time for considered action, and (2) that no act or failure to act on the part of Handlen contributed to the emergency. *Deignan v. New Amsterdam Casualty Co.* (1958), 2 Wis. (2d) 480, 87 N. W. (2d) 529.

Handlen was driving on Highway 54 at the rate of 50 miles per hour. His first view of the Cornelius car was from a distance of 300 feet from the point of collision. He did nothing for 200 feet and at 100 feet he became concerned and active about the collision. The evidence fails in every respect

to meet the fundamental requirements so as to entitle Handlen to the benefit of the emergency rule.

### Handlen's Causal Negligence as to Lookout.

The testimony further discloses that Cornelius maintained his pace from the tavern and along the driveway leading into Highway 54 without change to the point of collision. It further reveals factual situations from which the jury could not only infer, but could conclude that Handlen was causally negligent as to lookout and control. This presented a jury question and 12 members of the jury so found. *Vanderbloemen v. Suchosky* (1959), 7 Wis. (2d) 367, 97 N. W. (2d) 183.

*By the Court.*—Judgment affirmed.

CURRIE and FAIRCHILD, JJ. (*concurring*). Counsel for the defendants Dick Brothers, Handlen, and Yorkshire Indemnity Company requested the trial court to submit a question in the special verdict which would have inquired whether the plaintiff was negligent in exposing himself to danger by riding with Cornelius who was under the influence of intoxicants. The trial court failed to do so with the result that the only question in the verdict, which related to negligence on the part of the plaintiff, was question 5 that only inquired whether the plaintiff was negligent with respect to lookout. Such failure was not prejudicial because the jury returned a negative answer to question 8, the assumption-of-risk question, thus in effect finding that Baird had no actual or constructive knowledge that Cornelius had drunk sufficient intoxicating liquor to affect his driving appreciably.

The distinguished trial judge in his memorandum decision, passing upon the motions after verdict, stated:

"The court very seriously considered the submission of Baird's conduct all in the field of contributory negligence on two inquiries:

" 'Question 5: Just before the collision in question was the plaintiff, Joseph Baird, negligent in any of the following respects: (a) With respect to lookout? (b) Did he willingly expose himself to the risk of injury by entering and riding in the Cornelius automobile?'

"Question 6 would have related to cause.

"*It is hoped and anticipated that courts are on the threshold of abandoning the assumption-of-risk rule and submitting the elements of a guest's conduct in the contributory-negligence field, where they appropriately belong.*

"However, the usual timidity of a trial court for innovation in the face of established precedents asserted itself, and Baird's conduct was made the subject to two inquiries, contributory negligence and assumption of risk."   (Emphasis supplied.)

In a paper entitled, "Contributory Negligence and Assumption of Risk" presented by Judge WILLIAM E. GRAMLING to the recent annual meeting of the board of circuit judges, it was also advocated that assumption of risk be abolished in negligence cases as a defense separate and apart from contributory negligence.

A similar view is expressed in 2 Harper and James, Law of Torts, p. 1191, sec. 21.8:

"Except for express assumption of risk, therefore, the term and the concept should be abolished. It adds nothing to modern law except confusion. For the most part the policy of individualism it represents is outmoded in accident law; where it is not, that policy can find full scope and far-better expression in other language."

We are in complete accord with the conclusions expressed by Judges PARNELL and GRAMLING that the time has come to abandon the concept of assumption of risk in host-guest automobile accident cases and to hold that conduct, which our court has heretofore denominated assumption of risk, is but a phase of contributory negligence. As a phase of contributory negligence, conduct formerly constituting assump-

tion of risk would be subject to the comparative-negligence statute, sec. 331.045, and thus in most cases would have the effect of merely reducing the amount of the plaintiff's recovery.

The doctrine that now prevails of treating assumption of risk as a defense that is not only separate and apart from contributory negligence, but also is not subject to the comparative-negligence statute, frequently results in a miscarriage of justice. For example, in the instant case, if the jury had concluded that this was a drinking-companion case and had answered the assumption-of-risk question "Yes," instead of "No," the plaintiff would have recovered damages of $12,755.25, together with costs and disbursements, from Handlen, his employer, and the latter's insurance carrier, and nothing from Cornelius and his insurance carrier. Neither would any of the three defendants who paid such judgment be entitled to contribution from Cornelius or his insurance carrier.[1] Yet under the facts here present Cornelius was unquestionably far more negligent than was Handlen.

In host-guest automobile accident cases that involve only one automobile, or in two-car accident cases in which only the host-driver is found negligent, a finding of assumption of risk on the part of the guest results in the plaintiff's recovering nothing. Such a result often works a rank injustice. A typical illustration is afforded by the recent case of *Severson v. Hauck* (1960), 11 Wis. (2d) 192, 105 N. W. (2d) 369.

A rule of law which makes complete denial of recovery dependent upon the vigor of a wife's protests to her husband,

---

[1] This is because no common liability would exist between the host driver, Cornelius, and Handlen, the driver of the other vehicle, and such common liability is essential to the application of the doctrine of contribution. *Shrofe v. Rural Mut. Casualty Ins. Co.* (1950), 258 Wis. 128, 45 N. W. (2d) 76; *Farmers Mut. Automobile Ins. Co. v. Milwaukee Automobile Ins. Co.* (1959), 8 Wis. (2d) 512, 99 N. W. (2d) 746.

or her failure to leave the car many miles from home,[2] or whether a fifteen-year-old girl sufficiently protests against the reckless driving of an intoxicated driver and asks to be let out of the car,[3] is one which is open to question and ought to be re-examined.

This court has sought to ameliorate the harshness of the rule by holding that, if the host-driver is found guilty of several acts of negligence and the guest is found to have assumed one or more of such acts, but not all, the guest may still recover.[4] It has also refused to extend the doctrine of assumption of risk to those types of negligence cases in which a consensual relationship does not exist.[5]

Treating assumption of risk as a phase of contributory negligence would not be any startling innovation. As far back as 1934, Mr. Justice FOWLER in a concurring opinion in *Scory v. LaFave,* 215 Wis. 21, 35, 38, 254 N. W. 643, stated:

"It has been stated by many courts that assumption of risk and contributory negligence are the same. While this statement has been properly criticized as incorrect, it is not necessarily incorrect to say that assumption of risk is a form of contributory negligence. It is not illogical to conclude that assumption of risk is always contributory negligence . . .

[2] *Schinke v. Hartford Accident & Indemnity Co.* (1960), 10 Wis. (2d) 251, 103 N. W. (2d) 73.

[3] *Severson v. Hauck* (1960), 11 Wis. (2d) 192, 105 N. W. (2d) 369.

[4] *State ex rel. Litzen v. Dillett* (1943), 242 Wis. 107, 7 N. W. (2d) 599, 9 N. W. (2d) 80; *Bronk v. Mijal* (1957), 275 Wis. 194, 81 N. W. (2d) 481; *Jewell v. Schmidt* (1957), 1 Wis. (2d) 241, 83 N. W. (2d) 487; *Sprague v. Hauck* (1958), 3 Wis. (2d) 616, 89 N. W. (2d) 226; and *Haag v. General Accident Fire & Life Assur. Corp.* (1959), 6 Wis. (2d) 432, 95 N. W. (2d) 245. However, in *Tomchek v. Mutual Automobile Ins. Co.* (1959), 6 Wis. (2d) 577, 95 N. W. (2d) 220, it was held that such rule is not applicable where negligent speed of the host was the overpowering act of negligence and the guest had assumed such speed.

[5] *Schiro v. Oriental Realty Co.* (1956), 272 Wis. 537, 76 N. W. (2d) 355, 73 A. L. R. (2d) 1368; note, 1960 Wisconsin Law Review, 460, 468 *et seq.*

"It is to be borne in mind that the thing assumed in assumption of risk by a plaintiff is risk of injury to himself, and that a plaintiff's subjecting himself unreasonably to a risk of injury has always been, and I submit always will be, contributory negligence if injury results from the act from which risk of injury has been unreasonably assumed. To my mind attempt to apply the assumption-of-risk doctrine in host-and-guest cases was entirely unnecessary."

Eight years later the Minnesota court considered the problem in *Hubenette v. Ostby* (1942), 213 Minn. 349, 350, 6 N. W. (2d) 637, 638, and declared:

"However, what some cases call 'assumption of risk' (*Markovich v. Schlafke*, 230 Wis. 639, 284 N. W. 516) other cases deal with under the term 'contributory negligence.' *Gudbrandsen v. Pelto*, 199 Minn. 220, 271 N. W. 465; *Thorstad v. Doyle*, 199 Minn. 543, 273 N. W. 255. In some cases the expressions are used interchangeably. *Wright v. St. Cloud*, 54 Minn. 94, 55 N. W. 819; *Herdman v. Zwart*, 167 Iowa 500, 149 N. W. 631. The distinction between the two defenses was important in master-and-servant cases at common law, although even then the cases were in confusion as to what that distinction was. See *Rase v. Minneapolis, St. P. & S. S. M. R. Co.* 107 Minn. 260, 120 N. W. 360, 21 L. R. A. (N.S.) 138.

"In the ordinary personal-injury action, where plaintiff puts himself in a position to encounter known hazards which the ordinarily prudent person would not do, he assumes the risk of injury therefrom. *Such assumption of risk is but a phase of contributory negligence and is properly included within the scope of that term. Mosheuvel v. District of Columbia*, 191 U. S. 247, 257, 24 Sup. Ct. 57, 48 L. Ed. 170; *Houston, E. & W. T. R. Co. v. McHale*, 47 Tex. Civ. App. 360, 105 S. W. 1149; Restatement, Torts, sec. 466, comments *c, d;* Prosser, Torts, sec. 51, p. *379*." (Emphasis supplied.)

The following year the United States supreme court in *Owens v. Union Pacific R. Co.* (1943), 319 U. S. 715, 720, 63 Sup. Ct. 1271, 87 L. Ed. 1683, stated:

"The common-law defenses, assumption of risk, contributory negligence, and the fellow-servant rule were originated and developed in common ground [citing authorities including Bohlen, Voluntary Assumption of Risk, 20 Harvard Law Review (1906), 14, 91; and Bohlen, Contributory Negligence, 21 Harvard Law Review (1908), 233]. Not entirely identical in conception, they conjoined and overlapped in many applications. The overlapping areas first concealed, then created a confusion which only served to create more; so that in time the three became more, rather than less, indistinguishable. *And assumption of risk took over also, in misguided appellation, large regions of the law of negligence."* (Emphasis supplied.)

The Nebraska court has found no difficulty in holding conduct of a guest in an automobile accident case of a character, which would clearly constitute assumption of risk under Wisconsin decisions, to be contributory negligence and subject to its comparative-negligence statute. For example, the acts of a guest in riding with a host-driver, whom he knew to be a fast driver and in the habit of using intoxicating liquors, and in failing to leave the car when the host refused to heed the guest's repeated warnings regarding speed, were determined to be contributory negligence.[6]

There may be a type of assumption of risk that does not equate contributory negligence, and, therefore, is outside the operation of the comparative-negligence statute.[7] However, acts of implied acquiescence of an automobile guest in the negligent acts of the host-driver, which evince a disregard by the guest for his safety, constitute negligence and properly should be subject to such statute. It is to be hoped that this court will so determine when next faced with a host-guest case involving this issue.

[6] *Landrum v. Roddy* (1943), 143 Neb. 934, 12 N. W. (2d) 82.

[7] This is the view expressed by Professor Richard V. Campbell, Wisconsin Comparative Negligence Law, 7 Wisconsin Law Review (1932), 222, 241.

BROADFOOT, J. (*concurring*). I am not joining in the concurring opinion herein by Mr. Justice CURRIE and Mr. Justice FAIRCHILD for the reason that what is there stated is not necessary for the determination of this case. However, I agree with much of what has been stated therein and feel that the time has come when the question of assumption of risk should be re-examined by this court. However, before giving a final expression to my views of the matter I prefer to wait until the issue is squarely presented in a case and is fully argued on both sides.

I am authorized to state that Mr. Chief Justice MARTIN and Mr. Justice BROWN join in this concurring opinion.