## FELGNER v. ANDERSON.

### OPINION OF THE COURT.

1. WEAPONS—COMMON LAW—NEGLIGENCE—FIREARMS.

    The common-law rule is still extant that a very high degree of care is required from all persons using firearms in the immediate vicinity of others, no matter how lawful or even necessary such use may be, the test of liability being not whether the plaintiff's injury was accidentally inflicted, but whether the defendant was free from blame.

2. NEGLIGENCE—MEASURE OF CARE.

    The measure of duty of a negligence-charged defendant is reasonable care appropriate to the circumstances of the case, a standard which allows the fact finder to determine that some factual circumstances reasonably require greater or lesser diligence than do other circumstances in order to constitute reasonable or due care.

3. SAME—COMMON LAW—INSTRUCTIONS.

    The charge with respect to the common law of negligence made to a jury of laymen must be cast only in terms which a jury

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  56 Am Jur, Weapons and Firearms §§ 22, 23.
[2]  38 Am Jur, Negligence § 30.
[3]  38 Am Jur, Negligence §§ 362, 364.
[4]  53 Am Jur, Trial §§ 34, 74, 76.
[5]  38 Am Jur, Negligence § 172.
[6]  38 Am Jur, Negligence § 171.
[7, 9]  38 Am Jur, Negligence § 171.
   56 Am Jur, Weapons and Firearms § 26.
[8]  14 Am Jur, Courts §§ 59, 60, 132.
[10]  38 Am Jur, Negligence § 171.
   14 Am Jur, Courts § 84.
[11]  38 Am Jur, Negligence § 171.
[12]  56 Am Jur, Weapons and Firearms § 23.
[13, 15]  38 Am Jur, Negligence § 2.
[14]  38 Am Jur, Negligence § 31.
[16]  56 Am Jur, Weapons and Firearms §§ 22, 23.
[17]  38 Am Jur, Negligence §§ 23, 24.
[18]  56 Am Jur, Weapons and Firearms §§ 22, 23, 26.
   38 Am Jur, Negligence §§ 285, 363.

will understand impose a standard measured by that which a
reasonably prudent man would regard as reasonably required
by the specific factual circumstances of the case.

4. TRIAL—VOIR DIRE EXAMINATION—COMMENTS BY COURT—MISTRIAL
   —REQUEST TO CHARGE.

   Comment by trial court during *voir dire* examination relative to
   use of firearms and cause of an accident as to which the trial
   court directed a remark to jury before the *voir dire* examina-
   tion was ended that jury should disregard his previous reference
   to use of firearms and accident by firearms *held*, not rever-
   sible error as denying defendant a fair trial, where neither a
   motion for mistrial was then made nor a request for jury
   instruction to protect defendant against the harm alleged to
   have been caused.

5. NEGLIGENCE—ASSUMPTION OF RISK—CONTRIBUTORY NEGLIGENCE.

   The doctrine of assumption of risk is not an equivalent of con-
   tributory negligence.

6. SAME—ASSUMPTION OF RISK.

   Assumption of risk may not be interposed as a defense in an
   action based on the alleged negligence of defendant, except
   as there is involved an express contractual assumption of risk
   or in the statutorily limited application in actions arising
   out of certain employment relationships.

7. WEAPONS — RECKLESSNESS — OVERRULED CASE — ASSUMPTION OF
   RISK.

   Defendant in action for personal injuries, including amputation
   of leg, caused by the discharge of his shotgun while he and
   plaintiff were at a duck-hunting blind to which they had been
   assigned, some 3 hours after the duck-hunting season opened,
   *held*, not entitled to an instruction that plaintiff had assumed
   the risk of such injury, and that it was permissible to impose
   liability only where jury should find defendant's conduct was
   negligent, overruling *Waltanen* v. *Wiitala*, 361 Mich 504, and
   other cases.

SEPARATE OPINION.

BLACK, J.

8. COURTS—FUNCTION OF APPELLATE COURT OPINIONS.

   *The function of opinions of a court of last resort is not only to
   decide the case before it, but to provide reasonably certain
   guidance to the bench and bar.*

9. SAME—ASSUMPTION OF RISK—HUNTING ACCIDENT.

   *Separately held opinion that assumption of risk doctrine be
   eliminated in all negligence cases is subordinated to obtain ma-*

jority opinion in action arising from hunting accident holding that defendant was not entitled to instruction that plaintiff had assumed risk of injury from discharge of companion's shotgun.

SEPARATE OPINION.

SMITH and ADAMS, JJ.

10. NEGLIGENCE—ASSUMPTION OF RISK.

The determination to do away with the doctrine of assumption of risk in the field of negligence should not be made until that question is specifically before the Supreme Court.

DISSENTING OPINION.

KELLY, J.

11. NEGLIGENCE—ASSUMPTION OF RISK.

The gist of the defense of assumption of risk in an action for negligent injuries is that the plaintiff took his chances.

12. SAME—FIREARMS—SPORTSMEN.

Reasonable care and negligence are relative terms, and the degree of care required of a sportsman using a firearm must be commensurate with the dangers to be avoided.

13. SAME—DEFINITION.

Negligence is failure to exercise such care as is ordinarily exercised by the great mass of mankind under the same or similar circumstances.

14. SAME—QUANTUM OF CARE.

As the danger increases and the seriousness of injuries liable to occur from failure to avoid creating, or avoid meeting such danger, increases the quantum of care should increase and, as matter of common knowledge, with the great mass of mankind, does increase.

15. SAME—ACTIONABLE NEGLIGENCE.

Actionable negligence lies in the failure to exercise that degree of care which should be required of an ordinarily prudent person under the existing circumstances.

16. SAME—WEAPONS.

The liability of one handling or controlling a loaded gun does not depend upon gross negligence but exists if there is a failure to use the care which would have been used by a person of reasonable prudence in all the attendant circumstances.

17. Same—Foresight.
   *If the injury which resulted, and as to which there is no contro-*
   *versy, is one which ordinary care and foresight might not have*
   *reasonably anticipated, the defendant is not liable in this*
   *action.*

18. Weapons—Instruction—Burden of Proof—Hunting Accident.
   *Instruction in action arising from accident which occurred while*
   *plaintiff and defendant were duck hunting, whereby defendant*
   *was compelled to prove he was without fault if the jury be-*
   *lieved defendant's gun shot plaintiff constituted reversible*
   *error, especially where it followed trial court's remark during*
   *voir dire that an injury such as plaintiff suffered could not*
   *have occurred but for somebody's fault.*

Appeal from Berrien; Hadsell (Philip A.), J. Submitted May 8, 1964. (Calendar No. 80, Docket No. 50,449.) Decided March 1, 1965.

Case by Louis Felgner against Nelson R. Anderson for personal injuries sustained when shot while duck hunting. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Butzbaugh, Page & Byrns (Lester E. Page, of* counsel), for plaintiff.

*Gray, Gray, Globensky & Gleiss (Henry W. Gleiss,* of counsel), for defendant.

Souris, J. The only issue presented in this appeal which merits extended discussion concerns the refusal of the trial judge to charge the jury, as requested by defendant, on the doctrine of assumption of risk. Other issues presented need be mentioned only briefly.

About 3 in the afternoon of October 7, 1960, that being the first day of the duck season, plaintiff and defendant were duck hunting in a small flat-bottomed boat. The locale was the Schoolcraft marsh in

Kalamazoo county. The boat was seven feet long and three feet wide. Plaintiff was in the stern, facing the bow. Defendant was seated at the bow, facing the stern. The boat was partly in the water and partly on land, in a duck blind assigned to the two hunters by the "Fin and Feathers Club." One of several ducks (the first since the season-starting noon hour) suddenly approached the boat from behind plaintiff, directly toward defendant in the bow. Defendant testified:

"*Q.* The duck came towards you and curved off to approximately 3:00, is that right?[1]

"*A.* Very close to it, yes.

"*Q.* And then what happened?

"*A.* Well, I swung with it and shot.

"*Q.* And then what happened?

"*A.* Well, having the duck coming and changing as fast as it did, I swung so fast that when I shot—

"*Q.* Did you fall out of the boat?

"*A.* I fell right out of the boat.

"*Q.* And were you completely out of the boat?

"*A.* I was completely out of the boat. In fact, my shoulders were laying right in the water, and the water was ice cold. It was really cold.

"*Q.* That, you remember very distinctly?

"*A.* Yes, I do. In fact, I talked with Louie about it after I got back in.

"*Q.* Now, after shooting at the duck, did you pump the gun again?

"*A.* No, I did not. To me, I say no.

"*Q.* And after you fell out of the boat, or as you were falling, did your gun discharge again?

"*A.* No, it did not.

"*Q.* Do you think you would have known it? You would have felt it, or heard it?

"*A.* Yes, I am quite positive. I am positive I would have known it, in my mind.   *   *   *

[1] Defense counsel for clarity designated positions in the boat as related to a clock, with the bow indicated as 12:00.

"*Q*. Now, Mr. Anderson, are you positive that your 12-gauge Winchester pump shotgun did not discharge a second time and strike Louis Felgner in the leg?

"*A*. I am positive in my mind that it did not."

Plaintiff testified:

"Well, then I was sitting towards the side of the boat. I had my knee on the bottom of the boat and facing off to this side, to the left side, and I was watching the duck when Mr. Anderson started to stand up, so I put my gun up because I was already in place, and waited for the ducks to come, and I heard him shoot, but I didn't see no ducks.

"*Q*. Which side of the boat were you stationed at as you look at it forward, like this (indicating)?

"*A*. When the ducks were coming I was sideways in the boat, facing this way (indicating).

"*Q*. And where did the ducks come from?

"*A*. Well, the ducks were coming from the bow of the boat, but I never seen them after that.

"*Q*. Well, then what happened after the ducks came?

"*A*. Well, after he made that one shot, the boat started to wobble, so then I turned around to my right, turned around this way to my left, and there he was. He was out of the boat and in the water, and he was trying to catch himself on some cattails, and that's when his gun went off.

"*Q*. Then what happened?

"*A*. Well, when his gun went off and I seen that fire come out of the gun, I was hit, just like that.

"*Q*. Now, was he inside the boat, or outside the boat?

"*A*. He was outside the boat.

"*Q*. Did his gun go off once, or twice?

"*A*. Well, once when he shot at the ducks, and after he was in the water, that second shot."

Plaintiff was hit full in the left leg just below the knee. The surgeon described the wound as "about

the size of a man's closed fist." The leg was amputated just above the knee. There was testimony, based upon the size and nature of the hole in plaintiff's high boot, that the shot which injured him had to be fired at close range, estimated at about seven feet.

## I.

Defendant has appealed from an adverse jury verdict and judgment for $35,000 and, in addition to his principal claim that the trial judge erred in refusing his requested charge on the applicability of the doctrine of assumption of risk, objects to the judge's instruction that:

"If you find that it was the defendant's gun that shot the plaintiff, then it becomes the duty of the defendant to establish that he was completely without fault; that he was free from any negligence."

The instruction given was not erroneous. It reflected properly the common-law rule governing liability for injuries negligently inflicted by firearms. That rule recently was reaffirmed by this Court in *Bauer* v. *Saginaw County Agricultural Society,* 349 Mich 616, 622, 623, by reference to our earlier decision in *Bahel* v. *Manning,* 112 Mich 24 (36 LRA 523, 67 Am St Rep 381). In *Bahel,* at pages 29, 30, the following was stated to be the general rule:

"The general rule, and without reference to this statute, is that a very high degree of care is required from all persons using firearms in the immediate vicinity of others, no matter how lawful or even necessary such use may be. 7 Am & Eng Enc Law (1st ed), p 523. This same principle is stated in 2 Shearman & Redfield, Negligence (4th ed), § 686. In *Morgan* v. *Cox,* 22 Mo 373 (66 Am Dec 623), it was held that, where injury to another is caused by an act that would have amounted to trespass *vi et armis*

under the old system of actions, it is no defense that the act occurred through inadvertence, or without the wrongdoer's intending it; it must appear that the injury done was inevitable, and utterly without fault on the part of the alleged wrongdoer."

Lest the foregoing language quoted from *Bahel* be incorporated uncritically in a jury instruction hereafter, it should be noted that it is cast in language suitable for communication between lawyers, but hardly suitable for jury instruction purposes. In *Frederick* v. *City of Detroit*, 370 Mich 425, we held it would have been error to charge the jury that the defendant in a negligence case owed the plaintiff a "high degree of care". The measure of duty of a negligence-charged defendant is, as stated in *Frederick*, at page 431, "reasonable care *appropriate to the circumstances of the case,* a standard of negligence which allows the fact finder to determine that some factual circumstances reasonably require greater or lesser diligence than do other circumstances in order to constitute reasonable or due care." In a legal opinion addressed to bench and bar it is not inappropriate to speak in terms of degrees of care and caution, as a form of legal shorthand; but when a jury of laymen is charged on the common law of negligence, the charge must be cast only in terms which a jury will understand impose a standard measured by that which a reasonably prudent man would regard as reasonably required by the specific factual circumstances of the case.

## II.

Defendant also alleges error sufficiently prejudicial to require reversal of this jury verdict on the ground that the trial judge expressed the thought during *voir dire* examination that an injury such as plaintiff suffered could not have occurred but for

somebody's fault. Before the *voir dire* examination
had ended, the following statement was made by the
trial judge:

"*The Court:* Counsel has called my attention to
a statement I made with reference to my opinion re-
garding the use of firearms and injury by the use of
firearms. Now, that does not in any manner bind
the jury. It isn't given as an instruction, and I don't
think that the jury should pay any attention to what
the court says with reference to any kind of fact. In
fact, I'll instruct you that anything I have said or
may say during the proceedings in this case is not in-
tended to bind in any manner, or to present an opin-
ion on what the facts are here.

"Now, disregard, in other words, what I said with
reference to the use of firearms and the cause of an
accident by firearms.

"All right, proceed."

Apparently satisfied with the attempted correc-
tion of the patently improper comment made by the
trial judge, the matter was no further pursued by
defendant's counsel notwithstanding his present
claim that the error charged was so prejudicial that
defendant was thereby denied a fair trial. The
record before us, however, discloses neither a mo-
tion for mistrial at this early stage in the proceed-
ings nor a subsequent request for jury instruction to
protect the defendant against the harm he now al-
leges was caused him by the judge's statement. As
we have recently reiterated, in *Smith* v. *Musgrove,*
372 Mich 329, at 338–340, the time for correction
of such errors, if they can be corrected, is "when
time yet remains to set things right in the jury
room", quoting *Gilson* v. *Bronkhorst,* 353 Mich 148,
cited in *Reetz* v. *Rigg,* 367 Mich 35, at 41. See, also,
*Herbert* v. *Durgis,* 276 Mich 158.

III.

Relying upon *Waltanen* v. *Wiitala,* 361 Mich 504, decided by us in 1960, defendant claims reversible error in the trial judge's refusal of his request to charge the jury that plaintiff had assumed the risk of the injuries incurred and that plaintiff's assumption of such risk was, for defendant, a defense to the charge of negligence which he was entitled to have submitted to the jury. Normally, the applicability in negligence cases of the doctrine of assumed risk having been considered and reaffirmed by this Court so recently, we would take little time to reverse this judgment for the asserted error. However, having re-examined the common-law origins of the doctrine in the process of considering this appeal, it is our conclusion that we have strayed far afield from its proper and limited purposes in our precedential use of the doctrine.

When the doctrine was first developed in our common law in the 19th century, it was applied as a matter of judicial policy to negate an employer's liability for injuries incurred by his employees from dangers normally incident to the work in which engaged. The earliest reported case in this State in which the doctrine was considered is *Michigan Central R. Co.* v. *Leahey,* 10 Mich 193. Although decision was made in that case by an equally divided Court, all members of the Court were agreed with reference to the scope of the doctrine. Mr. Justice CAMPBELL wrote, at pages 199 and 200:

"The law may now be regarded as settled, that a master is not liable to a servant for the neglect of his fellow servants in doing or omitting to do their portion of the common work. He is only liable where his own personal neglect has directly contributed to the injury, or where he has not used ordinary dili-

gence in employing competent servants:[2]   *Wiggett v. Fox,* 36 Eng L & Eq 486, 492; *Tarrant* v. *Webb,* 37 Eng L & Eq 281; *Degg* v. *Midland R. Co.,* 40 Eng L & Eq 376; *Skipp* v. *Eastern Counties R. Co.,* 24 Eng L & Eq 396; *Hutchinson* v. *York Newcastle & B. R. Co.,* 5 Exch 343; *Wigmore* v. *Jay,* 5 Exch 354; *Farwell* v. *Boston & Worcester R. Corp.,* 4 Metc 49; *Hayes* v. *Western R. Corp.,* 3 Cush 270.

"The reason of the rule appears to be, that the master or employer for whose benefit work is undertaken cannot be regarded as contracting for anything more than his own personal care and diligence, and if he acts in good faith, the servant must run all those risks which may arise from others neglecting their duty. It must always be presumed that a master gives proper directions to his servants: *Scott* v. *Mayor of Manchester* [1 H & N 59, 156 Eng Rep 1117], 38 Eng L & Eq 477. His own interest would usually remove any contrary presumption. And there is no want of equity in requiring a servant to assume these risks. He has equal means of observing and guarding against impending danger with the master, and usually better opportunities."

Later in his opinion, at pages 201 and 202, Justice Campbell underscored the unique applicability of this doctrine to cases which arise from an employment relationship, thereby implicitly, if not expressly, excluding its use in other circumstances (pp 201, 202):

"Whether passengers in a vehicle, owned and conducted by others, are identified with them in their negligence, is a very different question from that which arises where there is an employment for service; and it is not necessary to consider how far such cases as have decided that point are to be followed. The decisions upon the rights and liabilities arising out of engagement in a common service rest on prin-

---

[2] See *post,* pp 37–39, for analysis of these cases, together with original and parallel citations.—Reporter.

ciples of their own, arising from general policy; and they have been made in view of the injustice of compelling employees [*sic*, employers?] to answer for that which their own care cannot prevent, to those whose opportunities for self-protection are as great, and usually much greater."

In the same case, Mr. Justice CHRISTIANCY described the limited scope of the doctrine of assumed risk and stated its rationale as follows (p 203):

"Where one man enters into the service of another to perform a particular kind of work, he is very properly held, as between himself and his employer, to assume the natural and ordinary risks incident to such service, arising from the negligence or misconduct of his fellow servants, as well as other risks not arising from the fault of the employer: and if the employer has acted in good faith and with ordinary care and prudence in the selection and employment of fit and competent servants, he should not be held liable to one of them for an injury arising from the negligence of his fellow servant: because it is fair to presume that the compensation was fixed with reference to such risks. But I am entirely unable to see how this consideration can shield other parties not in privity of contract with the person employed, from responsibility for injuries caused by their own negligence or that of their servants in transacting their business.

"As against all other parties except those who are privies to the contract, it is fair to presume that the servant did not intend to relinquish his right to compensation for injuries he might suffer from their negligence or misconduct; as to these the employer could have no interest in requiring such relinquishment, and consequently the compensation for the service cannot be supposed to have been fixed with reference to them. I, therefore, concur entirely in the views expressed by the supreme court of New York in *Young* v. *New York Central R. Co.*, 30 Barb (NY) 229, 234 and 235, that the exemption of the

employer from liability for injuries caused by one fellow servant to another, rests solely upon privity of contract, and cannot inure to the benefit of other parties."

Dean Prosser observes that *Cruden* v. *Fentham* (NP 1798), 2 Esp 685 (170 Eng Rep 496), "is perhaps the first clearly distinguishable case" to apply the doctrine of assumption of risk. Prosser, Torts (2d ed 1955), § 55, n 80. In *Cruden* plaintiff's servant was riding plaintiff's horse when it was struck by a one-horse chaise driven on the wrong side of the road by defendant, plaintiff's servant having tried to assert his right-of-way and to pass between defendant's chaise and a footpath. The report reads, in part:

"Lord Kenyon, in summing up to the jury, told them, that what was called the law of the road was introduced for general convenience: That where carriages were driving on a narrow road, or where accidents might happen, it ought to be adhered to; and in driving at night, the rule ought to be strictly adhered to, and never departed from, as it was the only mode by which accidents could be avoided: but he thought that where the road was sufficiently broad for all persons and carriages to pass, though a carriage might be driving on the wrong side of the road, if there was sufficient room for other carriages and horses to pass on the other, a person was not justified in crossing out of the way, in order to assert what he termed the right of the road. It was putting himself voluntarily into the way of danger, and the injury was of his own seeking. That seemed to be the case here: but the jury were to be of that opinion; if they thought otherwise, they would find for the plaintiff.

"The jury found a verdict for the plaintiff. * * *

"A rule was afterwards obtained for a new trial. In Easter term it came on, when the Lord Chief Justice delivered himself in nearly the same terms;

but added, that after the finding of the jury, as it was a question of public convenience, the verdict had better rest as it was.

"New trial refused."

It is unlikely that *Cruden* had signal significance upon the growth of the doctrine of assumption of risk, for its does not appear to have been cited in any subsequent reported decision.

*Ilott* v. *Wilkes* (KB 1820), 3 B & Ald 304 (106 Eng Rep 674), was an action by a trespasser who entered property upon which he knew spring guns had been placed and was injured when he triggered one. The court denied recovery and although it used terminology reminiscent of assumption of risk in so doing (*e.g.*, "The maxim of law, *volenti non fit injuria* applies; for he voluntarily exposes himself to the mischief which has happened") (p 311), it was not using that terminology in the sense of an affirmative defense to an established breach of duty. Rather, the effect of the use of such language in *Ilott* was to delimit the scope of duty of the landlord. The essence of the several opinions in *Ilott* is, that if a landlord has set spring guns on his property, but has given plaintiff notice thereof, the landlord has fulfilled his duty towards plaintiff if plaintiff is injured by a spring gun while an undiscovered trespasser. If after such notice plaintiff trespasses and is injured, defendant is not liable, not because plaintiff assumed the risk of injury, but, rather, because defendant discharged his duty towards plaintiff by the giving of notice. See the dissenting opinion of Scott, L.J., in *Adams* v. *Naylor,* 1 KB [1944], 750, 758, and the controlling opinion of Morton, J., 763–765.

As Dean Prosser notes, *supra,* the defense of assumption of risk "received its greatest impetus" from *Priestley* v. *Fowler* (Exch 1838), 3 M & W 1

(150 Eng Rep 1030), which denied recovery to plaintiff workman against defendant employer for injuries sustained while riding an overloaded van. Abinger, C.B., stated (p 6) that "The servant is not bound to risk his safety in the service of his master, and may, if he thinks fit, decline any service in which he reasonably apprehends injury to himself."

As discussed *supra,* the doctrine first appeared in Michigan in the case of *Michigan Central R. Co.* v. *Leahey,* 10 Mich 193. As seen in the quotation therefrom, *supra,* page 32, Justice CAMPBELL cited several English and American cases[3] [*Wiggett* v. *Fox,* 36 Eng L & Eq 486, 492; *Tarrant* v. *Webb,* 37 Eng L & Eq 281; *Degg* v. *Midland R. Co.,* 40 Eng L & Eq 376; *Skipp* v. *Eastern Counties R. Co.,* 24 Eng L & Eq 396; *Hutchinson* v. *York, Newcastle & B. R. Co.,* 5 Exch 343; *Wigmore* v. *Jay,* 5 Exch 354; *Farwell* v. *Boston & Worcester R. Corp.,* 4 Metc (45 Mass) 49; *Hayes* v. *Western R. Corp.,* 3 Cush (57 Mass) 270] to establish that "a master is not liable to a servant for the neglect of his fellow servants", noting in the next paragraph that "the servant must run all of those risks which may arise from others neglecting their duty."

All of the cases cited by Justice CAMPBELL involved attempts by a servant to hold his master liable for injuries allegedly attributable to the negligence of a fellow servant. An analysis of them indicates that the rationale of their decisions, all of which favored the employer, may be traced to the *Priestley Case.*

Thus, in *Wiggett* v. *Fox* (1856), 11 Exch 832 (156 Eng Rep 1069), a nonsuit was entered against plaintiff workman, Alderson, B., stating that the reason for the ruling was to be found in *Hutchinson* v. *York, Newcastle & B. R. Co.* (1850), 5 Exch 343 (155 Eng

---

[3] See *post,* pp 37–39, for analysis of these cases, together with original and parallel citations.—REPORTER.

Rep 150), and was "that the servant undertakes, as between him and the master, to run all ordinary risks of the service". 11 Exch 838. Alderson, B., also noted that "The workman, as was suggested in *Priestley* v. *Fowler,* may, if he thinks fit, decline any service in which he apprehends injury to himself." 11 Exch 839. In argument the cases of *Skipp* and *Farwell* had also been raised.

In *Tarrant* v. *Webb* (1856), 18 C B 797 (139 Eng Rep 1585), a new trial was ordered for defendant because the judge had instructed the jury that defendant might be liable to plaintiff if defendant had hired an incompetent fellow servant. *Priestley, Hutchinson, Wigmore,* and *Skipp* were raised in argument, but in the 3 opinions written, only 1 case was cited—that of *Degg,* by Cresswell, J.

In *Degg* v. *Midland R. Co.* (1857), 1 H & N 773, (156 Eng Rep 1413), the court denied recovery to a workman. In argument were cited the cases of *Ilott* v. *Wilkes, supra* (the spring gun case), and, pertinently, *Priestley, Hutchinson, Wiggett,* and *Tarrant.* Bramwell, B., quoted only from *Wiggett* that " 'a servant undertakes as between him and the master to run all ordinary risks of the service, including the negligence of a fellow servant' ". 1 H & N 773, 780.

In *Skipp* v. *Eastern Counties R. Co.* (1853), 9 Exch 223 (156 Eng Rep 95), no cases were cited in the opinions, although *Priestley, Hutchinson,* and *Wigmore* were discussed in argument.

In *Hutchinson* v. *York, Newcastle & B. R. Co.* (1850), 5 Exch 343 (155 Eng Rep 150), *Priestley* and *Wigmore* were cited in argument and Alderson, B., held that the case was undistinguishable from *Priestley,* stating, as to a fellow servant's negligence: "This was a risk which Hutchinson must be taken to have agreed to run when he entered into the defendants' service, and for the consequences of which,

therefore, they are not responsible." 5 Exch 343, 351.

In *Wigmore* v. *Jay* (1850), 5 Exch 354 (155 Eng Rep 155), judgment was, naturally, for defendant. *Priestley* and *Hutchinson* were cited both in argument and in the opinion by Pollock, C.B.

*Hayes* v. *Western R. Corp.* (1849), 3 Cush (57 Mass) 270, denied recovery to an employee in reliance upon *Farwell* v. *Boston & W. R. Corp.* (1842), 4 Metc (45 Mass) 49 (38 Am Dec 339). In *Farwell*, Shaw, C. J., concluded (p 56) that generally an employer is not liable to a servant for a fellow servant's negligence since "such risks and perils as the employer and servant respectively intend to assume and bear may be regulated by the express or implied contract between them". Relied upon were *Priestley* and *Murray* v. *S. C. R. Co.* (1841), 1 McMullan (S C) 385 (36 Am Dec 268). *Murray* contains no pertinent citations.

From a consideration of the authorities cited by Mr. Justice CAMPBELL, it is evident that the doctrine of assumption of risk as first promulgated in Michigan was a doctrine for use only in cases involving the master-servant relationship. The early case of *Cruden*, which applied the doctrine in different circumstances, never has been cited in this State or elsewhere, while *Ilott*, the spring gun case, appears in none of the opinions cited. It was mentioned in the arguments in *Degg*, but since no reference to it was made in *Leahey*, we may assume either that the Justices did not approve of its principles or they thought it not pertinent. In any event, the language of Justice CAMPBELL, *supra*, page 32, coupled with the failure to recognize the existence of cases like *Ilott*, render the conclusion almost inescapable that the doctrine of assumption of risk as adopted in *Leahey* was limited to employment relationships.

While continuing to apply the doctrine properly to cases arising from the employment relationship, some of which will be cited hereafter, regrettably this Court subsequently failed to restrict its use only to such cases. Perhaps a more accurate statement of the situation would be that the Court utilized the language of assumption of risk in its decisions of cases not involving the employment relationship with reference to which the doctrine of assumed risk properly could be applied. For example, see *Cook* v. *Johnston,* 58 Mich 437 (55 Am Rep 703). Other cases in which the language of assumed risk is used but where no employment relationship existed between the parties, will be mentioned later.

Notwithstanding a multitude of such cases where this Court invoked the doctrine of assumed risk, or at least spoke in language appropriate to the doctrine, in every conceivable kind of negligence action not involving the employment relationship, we find this Court saying, in *Parker* v. *Grand Trunk W. R. Co.,* 261 Mich 293, 296:

"Assumption of risk is a doctrine based upon implied contract or waiver. 4 Elliott on Railroads (3d ed), § 1850. The doctrine requires the relation of master and servant, or contract for services, and relates to risks in the course of such an employment. As said in *Bradburn* v. *Wabash R. Co.,* 134 Mich 575, 579:

" 'The principle of assumed risk rests upon the ground that it is an implied contract between the employer and the employee that the employee shall assume the risk of all dangers obviously incident to his employment.'

"Plaintiff was not an employee of defendant, therefore, the doctrine of assumption of risk has no applicability."

As late as 1951, in *Otto* v. *Hansen Wholesale Lumber Corp.,* 331 Mich 37, 40, this Court said:

"The question of whether plaintiff was furnished a safe place to work is not involved in the instant case. Nor is the defense of assumed risk. This is true since the relation of employer and employee or master and servant, to which these phases of the law are pertinent, did not exist and were not alleged in the instant case. See *Bauer* v. *American Car & Foundry Co.,* 132 Mich 537; *Swick* v. *Aetna Portland Cement Co.,* 147 Mich 454; *Kaukola* v. *Oliver Iron Mining Co.,* 159 Mich 689; *Parker* v. *Grand Trunk W. R. Co.,* 261 Mich 293."

For a similar statement of the limited use of the doctrine of assumption of risk, see *Teachout* v. *Grand Rapids, G. H. & M. R. Co.,* 179 Mich 388, 400. Note, however, that the opinion in *Teachout* quotes from *Bradburn* v. *Wabash R. Co.,* 134 Mich 575, 579, a statement which inaccurately suggests that an employee assumes the risk even of dangers negligently created by his employer. For a correct statement of the common law in Michigan as well as in England where the doctrine of assumption of risk first developed, see the quotations above from Justice CAMPBELL's and Justice CHRISTIANCY's opinions in *Michigan Central R. Co.* v. *Leahey, supra,* and the opinion of Mr. Justice COOLEY in *Quincy Mining Co.* v. *Kitts,* 42 Mich 34, 39, 40 (15 Am Neg Cas 745, 16 Am Neg Cas 58).

This Court's inexplicable failure to acknowledge in *Teachout, Parker,* and *Otto, supra,* that assumption of risk had been and was being used in circumstances involving other than the employment relationship perhaps encouraged continuation of such misuse of the doctrine notwithstanding the unequivocal language of limited scope used to describe its function in *Teachout, Parker,* and *Otto.*

Further complicating the law of assumed risk in this State, in addition to applying the doctrine or its language to cases not involving the employment re-

lationship and, therefore, beyond its proper scope, the Court also applied it as a virtual synonym of contributory negligence and, indeed, even as a means whereby a defendant's duty was expanded by additional risks it was claimed he assumed upon violations of statutory and common law. Time permits only selected examples of the misapplications of the doctrine of assumed risk here mentioned.

A particularly interesting pair of cases in which there is found the language of assumed risk, are *Heller* v. *Chicago & G. T. R. Co.,* 109 Mich 53 (63 Am St Rep 541), and *McKenzie* v. *Michigan Central R. Co.,* 137 Mich 112. In the *McKenzie Case* Mr. Justice GRANT wrote for the Court that the plaintiff shipper of livestock on defendant's railroad assumed the risk of unavoidable accidents and delays which precluded the plaintiff from timely feeding and watering his livestock. Justice GRANT relied upon the *Heller Case,* in which he also wrote the opinion for the Court. In *Heller,* Justice GRANT in turn relied upon an earlier case, *Michigan Southern & N. I. R. Co.* v. *McDonough,* 21 Mich 165 (4 Am Rep 466), in which this Court held that considerations of public policy did not permit the imposition of an insurer's liability upon railroads against damages to livestock in transport because if such liability were imposed, the cost of shipment of such freight would necessarily be prohibitive, whereas common carriers were then (1870) charging shippers a lower freight for taking "the care and risk upon themselves". Thus, we can see in these cases how the Court, inadvertently, adopted the language of assumed risk in reliance upon earlier cases which simply limited a common carrier's duty burden as a matter of public policy in allocating risks of damage to cargo between the shipper and the carrier.

*Schnepf* v. *Andrews,* 333 Mich 509, presents another unusual use of the language of assumption of

risk.   Plaintiff Schnepf sued for injuries which she claimed, and the jury found, resulted from the negligent acts of the defendant dance instructor while the latter was giving plaintiff a lesson in dancing the dance known as the "jitterbug".   In reversing a judgment for defendants *non obstante veredicto,* this Court said (pp 511, 512):

"Defendants claim that plaintiff assumed the risk of receiving injuries and that therefore she is not to be permitted to recover for the injuries received. Plaintiff assumed the foreseeable risk ordinarily incident to the giving and receiving of instructions in the jitterbug dance, but did not assume the risk of injury received through the negligent act of the instructor in giving the lesson, which risk could not be foreseen.   Defendants owed to plaintiff the duty to exercise the care and skill commensurate with the risk involved."

Once again we see in the foregoing quotation the use of assumption of risk language when the Court, quite obviously, was not applying the formal doctrine of assumed risk, for the doctrine clearly was inapplicable to the facts of that case.   What the Court said in *Schnepf* was that the defendants incurred no liability for plaintiff's injuries unless they were caused by the defendants' negligent conduct; that defendants owed no duty to plaintiff to protect her from injuries resulting from the ordinary activities of life not negligently caused by them; and that plaintiff "assumed the risk" of all such nonnegligently caused injuries.   Clearly, the doctrine of assumption of risk has no utility in such context, nor do we presume that our judicial predecessors intended by the use of the language, "assumed the risk", to suggest that the doctrine of assumed risk was being applied to this case.

While historically in this State assumption of risk is applied properly to injuries arising from an em-

ployment relationship (see *Bauer* v. *American Car
& Foundry Co.*, 132 Mich 537, 541, where this Court
adopted the rule quoted in the margin[4] from *Narra-
more* v. *Cleveland C. C. & St. L. R. Co.* [CCA 6], 37
CCA 499 [96 F 298, at 301, 48 LRA 68]) and,
technically, still is applicable to such cases, the in-
cidence of its utility today has been restricted dras-
tically by our legislature's adoption in 1912 of our
workmen's compensation law, PA 1912 (1st Ex
Sess), No 10.[5] By the first section of that act, the
legislature provided that it shall not be a defense
in a suit by an employee against his employer that
the employee was negligent, if such negligence was
not wilful; that injury was caused by a negligent
fellow servant; or that the employee assumed the risk
of employment. By section 3 of part 1, as amended,
the legislative bar of section 1 is made inapplicable
to actions to recover damages for death or injuries
sustained by household domestic servants and farm
laborers whose employers are not subject to the other
provisions of the act. Thus, the doctrine of assump-
tion of risk may still be applied to measure the duty
owed by an employer to his household domestic
servants and farm laborers, of course within the lim-
itations of that doctrine set forth in both opinions in
*Michigan Central R. Co.* v. *Leahey,* in the opinion of
Justice COOLEY in *Quincy Mining Co.* v. *Kitts,* and in

---

[4] "Assumption of risk is a term of the contract of employment,
express or implied from the circumstances of the employment, by
which the servant agrees that dangers of injury obviously incident
to the discharge of the servant's duty shall be at the servant's risk.
In such cases the acquiescence of the servant in the conduct of the
master does not defeat a right of action on the ground that the
servant causes or contributes to cause the injury to himself; but the
correct statement is that no right of action arises in favor of the
servant at all, for, under the terms of the employment, the master
violates no legal duty to the servant in failing to protect him from
dangers the risk of which he agreed expressly or impliedly to assume."

[5] CL 1948 and CLS 1961, § 411.1 *et seq.* (Stat Ann 1960 Rev and
Stat Ann 1963 Cum Supp § 17.141 *et seq.*).

*Bauer* v. *American Car & Foundry Co.*, all cited *supra.*

In all of the cases considered thus far, assumption of risk was used for the purpose of limiting the scope of the defendant's liability for the consequences of another's acts. This is the traditional sense in which the doctrine was originally developed as it was applied to employment cases. However, as has been seen from the livestock and dancing cases discussed above, assumption of risk has been applied essentially in this sense to other cases than employment cases without valid precedential authority for doing so.[6] Similarly we have used assumption of risk in still other cases in a sense which closely approximates the concepts involved in the defense of contributory negligence. Some effort has been made to suggest a rational and valid distinction between assumption of risk used in this sense and contributory negligence, see Prosser, Torts (2d ed 1955), § 55,

[6] Another type of case falling within this general classification, where assumption of risk is used to limit the scope of a defendant's liability, is the sport spectator case. Although there is authority for the proposition that a spectator injured while attending a baseball game, *e. g.*, by being struck by a ball, may be met with the affirmative defense that he "assumed this particular risk of injury", *Waltanen* v. *Wiitala*, 361 Mich 504, 509, the correct rule is stated in *Williams* v. *Wood*, 260 Mich 322, 327:

"The general rule that may be deduced from the cases hereinbefore cited is that certain risks of accident attend all outdoor sports and recovery may be had only if an injury is the result of negligence that could and should have been avoided by the use of ordinary care."

The correctness of this statement may have been obscured by the fact that elsewhere in the opinion the Court implicitly approved the use in such cases of the terminology of assumed risk. *E.g.*, 260 Mich 322, 330.

Thus, analysis indicates that the spectator's suit is barred not by his assumption of risk but rather by a lack of negligence on the part of the park owner. This, of course, is in the ordinary instance of a batted ball flying into unscreened stands. Certainly the situation would be different if a spectator sitting in a screened portion of the stands were injured because a batted ball passed through a hole which the park owner had neglected to repair. Then the owner might be liable for negligence and the spectator would not be barred by any "assumption of risk". See Keeton, Personal Injuries Resulting from Open and Obvious Conditions, 100 U Pa L Rev 629, 633 (1952).

but such fine distinctions, even if they withstood analysis, which we doubt, have never been made in any of our cases in which assumption of risk is used as an equivalent of contributory negligence. It is too late now in the law of this State to engraft an artificial rationalization for an indefensible misuse of a legal doctrine whose foundations in justice, even when applied properly, are tenuous at best.[7] The next group of cases cited and discussed are among those in which this Court has used assumption of risk either as a substitute for, or an equivalent of, or in addition to, contributory negligence. In each case assumption of risk has been used not to limit the defendant's liability for other than his own negligence, but rather to relieve a defendant of the legal consequences of his own negligent acts on the theory that the plaintiff assumed the risk of injuries from such negligent acts.

---

[7] See James, Assumption of Risk, 61 Yale L J 141, 168, 169 (1952):

"The doctrine of assumption of risk, however it is analyzed and defined, is in most of its aspects a defendant's doctrine which restricts liability and so cuts down the compensation of accident victims. It is a heritage of the extreme individualism of the early industrial revolution. But quite aside from any questions of policy or of substance, the concept of assuming the risk is purely duplicative of other more widely understood concepts, such as scope of duty or contributory negligence. The 1 exception is to be found, perhaps, in those cases where there is an actual agreement. Moreover, the expression has come to stand for 2 or 3 distinct notions which are not at all the same, though they often overlap in the sense that they are applicable to the same situation.

"Except for express assumption of risk, therefore, the term and the concept should be abolished. It adds nothing to modern law except confusion. For the most part the policy of individualism it represents is outmoded in accident law; where it is not, that policy can find full scope and far better expression in other language. There is only one thing that can be said for assumption of risk. In the confusion it introduces, it sometimes—ironically and quite capriciously —leads to a relaxation of an overstrict rule in some other field. The aura of disfavor that has come to surround it may occasionally turn out to be the kiss of death to some other bad rule with which it has become associated. We have seen how this may happen with the burden of pleading and proving an exceptional limitation on the scope of defendant's duty. There may be other instances. But at best this sort of thing is a poor excuse indeed for continuing the confusion of an unfortunate form of words."

In *Cook* v. *Johnston,* 58 Mich 437 (55 Am Rep 703), the Court reversed a judgment for plaintiff which she had been awarded for personal injuries caused by a fire the jury found to have been negligently set by defendant. It seems quite clear from the opinion of the Court in this case that reversal of the judgment was based upon the Court's finding that plaintiff's conduct constituted contributory negligence as a matter of law notwithstanding the Court's regrettable use of words suggesting the application of the doctrine of assumption of risk (p 440):

"The principal question in the case was upon the liability of defendant if the fire took from negligence for which she may have been chargeable for the damages on which recovery was had in this case.

"The plaintiff showed by her testimony that she and her husband saw the ash-barrel daily and knew all about its position. It also appears by the showing of both that the shed, which was entirely open within from end to end, above the partitions, was burning so brightly as to wake them up, and continued burning when they entered to loose the horse and get out the buggy. The danger was before their eyes, and what happened by the sweeping down of the flames was as likely to happen as not. It is not very important by what name the action of plaintiff should be called. It was such a risk as she chose to take, to save her husband's property. But it was a plain and palpable risk nevertheless, and the injury would not have occurred unless for her voluntary act in assuming the exposure."

The use of assumption of risk language in the *Cook Case* in the sense of contributory negligence was recognized by this Court in the case of *Harris* v. *Township of Clinton,* 64 Mich 447 (8 Am St Rep 842), where, at page 455, the Court, citing *Cook* v. *Johnston,* said: "If the danger is known, and can be easily avoided, a peril voluntarily and unnecessarily

assumed may constitute such contributory negligence as would preclude a recovery". In this same sense, while citing both the *Harris* and the *Cook Cases,* the Court in *Taylor* v. *Home Telephone Co., 163* Mich 458 (31 LRA NS 385), affirmed a directed verdict for defendant, expressly asserting an interrelationship between the doctrine of assumed risk and contributory negligence in the following language appearing at pages 460 and 461:

"The plaintiff's act was voluntary, the wetting[8] she got was inevitable. Did she, as defendant contends, assume all the consequences of the wetting, whatever they might be? The principle expressed in the maxim, '*Volenti non fit injuria,*' is subject to qualifications, which are sometimes stated as qualifications of the rule, but are quite as often recognized as rules in determining the proximate cause of an injury and the contributory negligence of the injured person."

*Hemington* v. *Hemington, 221* Mich 206, was a case in which plaintiff sued her daughter to recover damages for injuries received in an automobile accident while she was a passenger in her daughter's car. In the following passage the Court demonstrates its confusion of assumed risk with contributory negligence, while declining to apply either doctrine as a bar to plaintiff's recovery (pp 208, 209):

"It is claimed that the plaintiff voluntarily put herself in a place of danger by re-entering the car

---

[8] It appears from the opinion of the Court that defendant's agents negligently removed a service cock from a water main with the result that a stream of water under pressure was forced into an open second story window of an adjoining building in which plaintiff resided. We are told in the Court's statement of facts that plaintiff "attempted to close the window, was knocked down by the force of the stream of water, her clothing soaked with water, and as a consequence she was chilled, became sick and disordered, was afflicted with rheumatism, et cetera, from which she still suffers, and has been obliged to lay out money in an effort to cure herself. * * * [She] gave as the reason for exposing herself her desire to prevent injury to the room and its contents."

at Ortonville to ride with one she then knew was reckless and had refused to pay any heed to her remonstrances, and that in law she assumed the risk and cannot recover. We are not impressed with this claim. At the most it was a question of fact for the jury, and the circuit judge very properly left it there.

"Our attention is directed to cases of intoxicated drivers where it has been held that it is contributory negligence to continue to ride with such a person after knowledge of his condition and with opportunity to leave the car. We cannot make such decisions fit this case. Intoxication temporarily destroys the faculties essential to safe driving, and this is of such common knowledge that no one with sense will submit to the peril of riding with such a person."

See, also, *Cadagan* v. *Great Atlantic & Pacific Tea Co.,* 298 Mich 207, 212, *Ruby* v. *Buxton,* 305 Mich 64, *Teeter* v. *Pugsley,* 319 Mich 508 (where, as noted in *Davis* v. *Hollowell,* 326 Mich 673 (15 ALR 2d 1160), and in *Waltanen, supra,* at page 508 of 361 Mich, the Court cited *Gibbard* v. *Cursan,* 225 Mich 311, and *Sherman* v. *David,* 293 Mich 489, in support of its summary denial of defendant's claims of error relating to contributory negligence and assumption of risk, but *Sherman* made no reference either to contributory negligence or to assumption of risk and *Gibbard,* although discussing contributory negligence, did not refer to assumption of risk); and *Davis* v. *Hollowell, supra.* Compare the foregoing cases with *Modzel* v. *Norwalk Truck Lines,* 325 Mich 693. In *Modzel,* the Court, although citing *Cadagan* v. *Great Atlantic & Pacific Tea Co., supra,* found contributory negligence on the part of the plaintiff (as a matter of law) and, instead of using or, more accurately, misusing, the language of assumption of risk, properly said that plaintiff "chose a place which he knew or should have known was a

place of danger, and was guilty of contributory negligence which was a proximate cause of his injury." 325 Mich 693, 698.

The foregoing cases are only some, and certainly not even most, of the cases in which this Court unfortunately appears to have confused assumption of risk with contributory negligence and it has done so when, as the *Modzel Case, supra,* demonstrates, there is no need to engraft concepts of assumption of risk upon contributory negligence.

Another group of cases uses the language of assumption of risk in a manner which defies classification either as a statement of the defendant's limited liability for another's negligence or as a doctrinal companion of contributory negligence. For example, in *Milbourne* v. *Arnold Electric Power Station Co.,* 140 Mich 316 (70 LRA 600), an employment case, at page 321, the Court said:

"The danger that was risked, the danger which an ordinarily prudent person should have apprehended, was that of falling or being thrown off the car by its ordinary management. The risk of that danger was undoubtedly assumed by plaintiff, but he would not therefore be guilty of contributory negligence, unless no person of ordinary prudence would have assumed that risk."

Apparently in the first sentence of the foregoing quotation, the Court was saying that the defendant owed plaintiff, its employee, no liability for his injuries incurred from ordinary nonnegligent management of its affairs—a valid statement of the limited liability of an employer under the doctrine of assumed risk. However, in the second sentence of the foregoing quotation, the Court unfortunately equates the plaintiff-employee's assumption of the ordinary risks of his employment with contributory negligence if his assumption of such risks is

unreasonable. Clearly, whether or not an employee's general assumption of the ordinary risks of employment is reasonable or unreasonable has nothing whatever to do with contributory negligence. Such contributory negligence must, instead, relate to a specific act or failure to act of the employee, which a fact finder could determine was unreasonable. Undoubtedly this is what was intended, but the imprecise language used by the Court suggests a basic confusion between assumption of risk and contributory negligence which occurs throughout the legal history of this State. Other examples in which there is uncertainty in the sense in which the language of assumed risk is used are *Reedy* v. *Goodin,* 285 Mich 614, and *Pace* v. *Gibson,* 357 Mich 315. In *Reedy,* at page 620, we find the following equivocal language:

"One may, of course, impliedly waive his right of action against another for negligence by voluntarily assuming the risk and he may not recover against another even though such other person is negligent if his injury results from his own voluntary wrong. This is the basis of the maxim *volenti non fit injuria.* But, in this case, the questions of defendant's negligence and plaintiff's freedom from contributory negligence are questions of fact. There was ample testimony to sustain the findings of the trial court."

In *Pace,* at page 325, the following appears:

"Under the circumstances here presented it cannot be said as a matter of law that plaintiff was a mere volunteer. He did not, in consequence, assume the risk of being injured by ordinary negligence on the part of defendant or his employee, and may not be charged with contributory negligence on such basis."

Still another group of cases in this State use the language of assumed risk in the sense that one who violates a law, either statutory or common, "assumes the risk" of such extraordinary conduct. This use of the ubiquitous language of assumed risk has been applied not only to plaintiffs, but more surprisingly to defendants. Most prominent among this group of cases is *Winckowski* v. *Dodge*, 183 Mich 303. At pages 308 and 309 the following appears:

"If, as claimed by defendants, there were justifying circumstances tending to show it necessary for the driver to take the left side of the road, the question was of fact for the jury and not of law for the court. If facts were shown warranting the driver in passing to the left, it then became his duty to observe that degree of caution and proceed with care at such reduced speed as was commensurate with the unusual conditions.

" 'One who violates the "law of the road" by driving on the wrong side assumes the risk of such an experiment and is required to use greater care than if he had kept on the right side, * * * and if a collision takes place in such circumstances, the presumption is against the party who is on the wrong side.' *Angell* v. *Lewis*, 20 RI 391, 393 (39 A 521, 78 Am St Rep 881)."

Why it was thought necessary by the Rhode Island court, whose language we adopted in *Winckowski*, to include the clause "assumes the risk of such an experiment and" is unclear, for that clause can be eliminated from the quoted passage and there would remain a coherent and eminently correct statement of the law.

Unhappily, this use of assumption of risk to enlarge a law violator's, particularly a defendant law violator's, duty is not uncommon. See *Black* v. *Parke, Davis & Co.*, 211 Mich 274, 278; *Lawrence* v. *Bartling & Dull Co.*, 255 Mich 580, 582; *Warwick* v.

*Blackney,* 272 Mich 231, 237; *Eskovitz* v. *Berger,* 276 Mich 536, 539; *Curby* v. *Mastenbrook,* 288 Mich 676, 682, 683; *Bahlman* v. *Hudson Motor Car Co.,* 290 Mich 683, 695; and *Samuelson* v. *Olson Transportation Co.,* 324 Mich 278, 283.

The foregoing discussion of our precedents does not exhaust the cases in this jurisdiction in which the doctrine of assumption of risk has been applied inappropriately. The cases cited demonstrate only that we have been less than restrained in our use of the doctrine within the properly limited scope of its common-law origin and that we have been less than consistent in the purposes for which we have relied upon the doctrine or its language. Considerable care has been taken to identify all of the uses to which the doctrine has been put in this State, but without effort to cite all of the cases in which it has been invoked, properly or improperly. Our purpose in doing so has been to demonstrate the need for re-evaluation judicially of the doctrine's current utility. Other courts have been engaged recently in like effort. See *Baird* v. *Cornelius* (1961), 12 Wis 2d 284 (107 NW2d 278, 285) (concurring opinion 297), and *McConville* v. *State Farm Mutual Automobile Ins. Co.* (1962), 15 Wis 2d 374 (113 NW2d 14). One year following the original suggestion to do so contained in the concurring opinion in *Baird* v. *Cornelius, supra,* the Wisconsin supreme court, in *McConville* v. *State Farm Mutual Automobile Ins. Co.,* expurgated the doctrine of assumption of risk as it had been applied theretofore in automobile guest passenger negligence cases in Wisconsin, a State whose legislature had not adopted a guest passenger act as has ours.[9] Far more extensive, however, was the expurgation of assumption of risk in New Jersey. There, in *Meistrich* v.

9. CLS 1961, § 257.401 (Stat Ann 1960 Rev § 9.2101);

*Casino Arena Attractions, Inc.* (1959), 31 NJ 44 (155 A2d 90, 82 ALR2d 1208), the supreme court of New Jersey, in an opinion by Mr. Chief Justice Weintraub, held that the terminology of assumption of risk should not be used thereafter in New Jersey excepting only in its "primary sense" to mean that defendant either owed no duty or did not breach the duty owed. Thus was eliminated from New Jersey the use of assumption of risk in what is called its "secondary sense" as an affirmative defense to an established breach of duty, in the same manner contributory negligence is an affirmative defense to an established breach of duty. The New Jersey court instructed that State's trial courts (p 55) that when assumption of risk in its primary sense, as defined above, was to be utilized:

"It will not matter whether a trial court makes or omits a reference to assumption of the risk, provided that if the terminology is used the jury is plainly charged it is merely another way of expressing the thought that a defendant is not liable in the absence of negligence; that a plaintiff does not assume a risk defendant negligently created, *cf. Ford* v. *Reichert* (1957), 23 NJ 429, 434 (129 A2d 439); and that if defendant is found to have been negligent, plaintiff is barred only if defendant carries the burden of proving contributory negligence, *i.e.*, plaintiff's failure to use the care of a reasonably prudent man under all of the circumstances either in incurring the known risk or in the manner in which he proceeded in the face of that risk."

The *Meistrich Case* was decided in 1959. Four years later, in *McGrath* v. *American Cyanamid Co.* (1963), 41 NJ 272 (196 A2d 238), in a *per curiam* opinion, New Jersey disposed of the last vestiges of assumption of risk in the following manner (pp 274–276):

"In *Meistrich* v. *Casino Arena Attractions, Inc.* (1959), 31 NJ 44 (155 A2d 90, 82 ALR2d 1208), we pointed out that assumption of the risk was theretofore used in two incongruous senses: in one sense it meant the defendant was not negligent, while in its other sense it meant the plaintiff was contributorily negligent. We said that in truth there are but two issues—negligence and contributory negligence—both to be resolved by the standard of the reasonably prudent man, and that it was erroneous to suggest to the jury that assumption of the risk was still another issue.

"It was our hope that after *Meistrich* the bench and bar would focus upon the true issues, but unhappily some cling to the terminology of assumption of risk and continue to be misled by it even while purporting to think of it as merely a convertible equivalent of negligence or contributory negligence. * * *

"In *Meistrich* we said the terminology of assumption of the risk should not be used when it is projected in its secondary sense, *i.e.*, that of contributory negligence (31 NJ at p 55, 155 A2d at p 96, 82 ALR2d at 1217). We thought, however, that 'perhaps a well-guarded charge of assumption of risk in its primary sense will aid comprehension' (31 NJ p 54, 155 A2d p 96, 82 ALR2d 1217). * * * Experience, however, indicates the term 'assumption of risk' is so apt to create mist that it is better banished from the scene. We hope we have heard the last of it. Henceforth let us stay with 'negligence' and 'contributory negligence.' " 196 A2d 238, 239–241.

Considering our conclusion that the doctrine of assumption of risk in this State properly is applicable only to cases in which an employment relationship exists between the parties, as well, perhaps, where there has been an express contractual assump-

tion of risk,[10] and considering the relative infrequency of such cases today, we need not go so far as did New Jersey's supreme court to eliminate the confusion and possible injustice resulting from the misuse of the assumption of risk doctrine and its language. Hereafter, when assumption of risk is used in cases between employee and employer for injuries incurred in the course of employment and where the statutory bar of the workmen's compensation act, *supra,* is not applicable and in cases where it is claimed there has been an express contractual assumption of risk, it should be made clear to the jury, if there is one, that the doctrine serves only the purpose of limiting the scope of a defendant's liability for injuries caused to the plaintiff and has no utility in barring recovery where defendant has been found to have negligently breached a duty owed to plaintiff. Assumption of risk should not again be used in this State as a substitute for, or as a supplement to, or as a corollary of, contributory negligence; nor should it be used to explain a law violator's enlarged duty of due care resulting from his violation of law. The traditional concepts of contributory negligence are more than ample to present that affirmative defense to established negligent acts. See 2 Harper and James, The Law of Torts, § 21.1 *et seq.* (1956). Language other than that of assumption of risk easily can be found to describe the enlarged scope of the duty of due care imposed upon one who voluntarily violates statutory or common-law standards of due care.

The cases cited above, including *Waltanen* v. *Wiitala,* 361 Mich 504, and all other cases decided by this Court in which the doctrine of assumption of risk or its language has been used improperly as

---

[10] See *Toledo Plate & Window Glass Co.* v. *John Henry & Schram Storage & Trucking Co.,* 250 Mich 648.

determined in the foregoing opinion, hereby are overruled.

The trial judge's refusal to charge the jury on assumption of risk as defendant requested him to do was not error. Judgment affirmed.

T. M. Kavanagh, C. J., and Dethmers, Black, and O'Hara, JJ., concurred with Souris, J.

Black, J. (*concurring in affirmance*). This case, having been previously assigned to the writer according to our practice, was submitted May 8th last. Accordingly, and on May 28th an opinion was submitted to the other members of the Court, proposing that the circuit court's judgment be affirmed by flatly overruling, in answer to the principally posed question of assumption of risk (stated question 3),* the patently errant case of *Waltanen* v. *Wiitala*, 361 Mich 504; and by holding for specified reasons that defendant-appellant's combinative questions 1 and 2 call for negative answers. Since then Justice Souris, reaching the same conclusions and results as were thus earlier submitted, has written separately and more exhaustively to affirm. I concur fully, as verified below.

---

* Defendant-appellant's statement, of the 3 questions regarded as worthy of review, is as follows:

"1. Did the court err on *voir dire* examination in not permitting the defendant to excuse for cause jurors who stated that if there were a hunting accident involving a shooting then there must have been someone at fault or there would not have been a shooting; the court stating to the prospective jurors that he agreed that in a hunting accident there must be fault on someone's part?

"2. Did the court err on *voir dire* examination in making a statement to the jury as follows:

" 'I think I'd agree with her (the prospective juror). It wouldn't necessarily be the fault of the defendant, but would have to be somebody at fault * * *' if there is a shooting on a hunting trip.

"3. Did the court err in giving its charge in that it failed to give a separate requested charge with regard to the assumption of risk by the plaintiff."

Too many of our decisions in recent years have been made and recorded, regrettably in critically important cases, by means of divisive or separate opinions the sum of which, far from furnishing that reasonably certain guidance every court of last resort is supposed to provide, spell no more than a "contend and decide as you please" message to bar and bench. The sad result has been a fecund procreant of litigation rather than a dependable composer thereof, with each new contender appraising as best he can, not the discordantly written "law" to which I refer, but the fallible human element of the judicial process, that is, the philosophical bent of the reinless trial judge.

In effort to arrest, whenever possible, repetition of such judicial disservice, I have decided—and have already started—to adopt the practice of withdrawing opinions submitted in situations such as have developed here, the better to eliminate need for reading evermore bulging pagination of our reports and to gain unequivocal majority support of a definitely controlling opinion; an opinion upon which lawyers and judges may fairly depend. I do so here. In token thereof my signature has been affixed to Justice Souris' aforesaid opinion, and my May 28th opinion is now withdrawn.

The opinion of Justice Souris covers *inter alia* all authorities, including the 2 recent and pungent New Jersey cases,* which in such withdrawn opinion were aimed at abrupt rejection of that incredible folly recorded under the name of *Waltanen v. Wiitala*. I repeat here, for the record, what was written in such withdrawn opinion of the situation in New Jersey:

---

* *Meistrich* v. *Casino Arena Attractions, Inc.*, 31 NJ 44 (155 A2d 90, 82 ALR2d 1208); *McGrath* v. *American Cyanamid Co.*, 41 NJ 272 (196 A2d 238).

"Late last fall the supreme court of New Jersey was compelled to speak again, this time with bluntness. In *McGrath* v. *American Cyanamid Co.*, 41 NJ 272, 274, 276, (196 A2d 238, 240, 241), having referred to *Meistrich* as follows:

" 'It was our hope that after *Meistrich* the bench and bar would focus upon the true issues, but unhappily some cling to the terminology of assumption of risk and continue to be misled by it even while purporting to think of it as merely a convertible equivalent of negligence or contributory negligence,' the court concluded:

" 'Experience, however, indicates the term "assumption of risk" is so apt to create mist that it is better banished from the scene. We hope we have heard the last of it. Henceforth let us stay with "negligence" and "contributory negligence". ' "

I would iterate and reiterate the above for Michigan. Unlike Justice SOURIS, I would go just as "far as did New Jersey's supreme court to eliminate the confusion and possible injustice resulting from the misuse of the assumption of risk doctrine." However, since a majority of the Court agrees with Justice SOURIS' milder method of treatment, I have joined him for the sake of as much unanimity as the case at hand can possibly brew for this area of negligence law.

ADAMS, J. (*concurring in affirmance*). I concur with Justice SOURIS in affirmance of the trial judge for the reasons stated in sections 1 and 2 of his opinion. I do not believe it essential to decision in this case to determine that the doctrine of assumption of risk should be done away with in this State. The trial judge concluded that a charge as to assumption of risk should not be given to the jury since assumption of risk is not in the case. I agree with that analysis of the proofs. I would defer considera-

tion of the elimination of this doctrine until such
time as that question is specifically before the Court.

SMITH, J., concurred with ADAMS, J.

KELLY, J. (*dissenting*). This will be this Court's
first decision as to what constitutes negligence and
due care in hunting accident cases, and its impor-
tance becomes more apparent when we realize that
over one million hunters purchase licenses each year.
During the deer hunting season that just came to
a close (December 1, 1964) over 500,000 hunters en-
tered the woods with the following results: Deer toll,
115,000; 11 hunters dead by gunshot, and 48
wounded.[1]

That hunting accidents are not confined to deer
hunters is disclosed by the small game record of
1963, showing over 600,000 licenses issued and 12
fatal accidents and 164 nonfatal accidents.

The problem presented in the instant case and
the necessity of proper instructions to the jury is
disclosed by the trial judge's summation to the jury
of the parties' claims, as follows:

"The plaintiff claims that the defendant stood up
in the front of the boat, and that he, the plaintiff,
was seated in the rear of the boat. He claims that
the defendant shot at a duck; that the defendant fell
down immediately after he shot, and that as he
fell his gun discharged the second time and that the
shot from the defendant's gun entered the plaintiff's
left leg.

"It is the claim of the plaintiff that the defendant
failed to use due care required under the circum-
stances then existing. Specifically, the plaintiff
claims that Mr. Anderson was negligent in shooting

[1] Preliminary figure, which will be revised as later reports are re-
ceived. Figures for the 1963 season are from official records of the
State conservation department.—REPORTER.

his gun from a place or position in which there was
danger that he would lose his balance in shooting
his gun from a standing position, in a boat, which
would rock or roll with the impact, and in shooting
his gun at a time when he did not have the boat
under complete control, and in pumping or in refilling
the chamber of the pump shotgun at a time when he
did not have his boat and his gun under complete
control."

A concise statement of the court's analysis of de-
fendant's claim is as follows: Plaintiff and defend-
ant were hunting as they had, in the same marsh,
on many previous occasions and, on the day of the
accident, they were following their normal pro-
cedure; that it was not the defendant's gun that
shot the plaintiff; that on or about the time plain-
tiff was shot the defendant fired only one shot and
the shot was fired into the air at a duck and in falling
out of the boat after the shot was fired the defend-
ant's gun did not discharge, but the gun of another
party did discharge; that if the jury should find that
the shot which struck plaintiff was from defendant's
gun, he is not in any way liable because the dis-
charge would have been purely unintentional and
accidental; that the plaintiff assumed the risk of
these acts when he joined the defendant in the hunt-
ing expedition, knowing from past experiences that
they were using a boat and that either or both of
them would be standing in the boat and knowing
that either or both of them would be firing from a
standing position; that the plaintiff participated in
placing the boat in the position on the stumps and,
therefore, if it was negligently placed plaintiff would
have directly contributed to his injury.

From the legal maxim *"Volenti non fit injuria,"*
meaning "that to the consenting no injury is done,"
there is created a defense known as assumption of
risk. Appellant claims the court erred in not giv-

ing him the benefit of this defense and in denying his request that the jury be instructed that: "A person who knows that another has created a danger or is doing a dangerous act and who nevertheless chooses to enter upon or to remain within the area of risk is not entitled to recover for harm unintentionally caused to him."

We have established the far-reaching effect of this defense of assumed risk by stating:[2]

"Assumption of risk, of course, is a defense to negligence, whether it be ordinary 'mere' negligence, or such negligence 'plus a wilful and wanton disregard for public safety,' which go to make up the statutory 'gross negligence or wilful and wanton misconduct' required under the guest passenger act. *Volenti non fit injuria.* Whether the defendant's conduct was reckless or merely casually negligent is immaterial, for the gist of the defense is that the plaintiff took his chances."

The 1963 record showing 1,164,360 licenses issued with 18 fatal and 220 nonfatal accidents, does not put hunting in that dangerous category or column where the careless, negligent, or reckless hunter can excuse himself by saying "you consented, therefore no injury was done—you took your chances, therefore you can't recover damages."

Eleven hunters were killed during the 1964 deer hunting season. Over the Thanksgiving weekend (6 p.m. Wednesday to midnight the following Sunday) 26 people were killed in automobile accidents in that less than five-day period. It would be just as logical to apply the doctrine of assumed risk to automobile driving as it would to apply it to hunting.

Justice Souris' opinion disclosing extensive research concludes that this Court has in the past im-

[2] *Waltanen* v. *Wiitala,* 361 Mich 504, 508.

properly applied assumed risk in many cases and recommends a greatly restricted application of this doctrine in the future.

Michigan's application of this rule has been similar to several States held in high repute, among which are California, Pennsylvania, Massachusetts, New York, and Ohio.

· It is not necessary in this appeal to agree or disagree with Justice SOURIS' indictment of the past and recommendation for the future. Suffice it is to agree with his final sentence that: "The trial judge's refusal to charge the jury on assumption of risk as defendant requested him to do was not error."

The court instructed the jury:

"If you find that it was the defendant's gun that shot the plaintiff, then it becomes the duty of the defendant to establish that he was completely without fault; that he was free from any negligence."

Appellant, in paragraph 7 of his motion for judgment notwithstanding the verdict, stated:

· "That the court erred in its charge to the jury in that it stated that once the jury had decided that it was the defendant's gun that shot the plaintiff, then the burden of proof shifted to the defendant to show that he was utterly without fault or that the accident was inevitable. This charge improperly shifted the burden of proof and placed upon the defendant a burden of proof that should properly have been the plaintiff's."

In his ruling on defendant's motion, the court answered appellant as follows:

"On the question involved in 7, the court feels duty bound to follow *Bahel* v. *Manning,* 112 Mich 24 (36 LRA 523, 67 Am St Rep 381) which was quoted with approval in *Bauer* v. *Saginaw County Agricultural Society,* 349 Mich 616.

"The charge of the court to the jury was taken practically verbatim from the *Bahel Case.* I should say in this connection that I think the *rule is too harsh,* but being admonished by certain members of the Supreme Court that the trial court shouldn't attempt to change the law, but should take it as it then exists—*required me to give the charge that I gave.*

"I think the rule should be something of this nature: That is, when hunters go out together there is a certain element of assumed risk, which is to the effect that the other hunter will not be guilty of failure of due care in connection with the use of firearms and the necessary risks incident to hunting ventures, and that they should not become insurers, as they are under the rule as it is in the *Bahel Case.*" (Emphasis ours.)

I am in full accord with the trial court's statement that his charge was "too harsh," but disagree with his conclusion that he was required to give that harsh rule because of our decisions in *Bahel* v. *Manning* and *Bauer* v. *Saginaw County Agricultural Society, supra.*

*Bahel* decided a defendant's responsibility for shooting plaintiff in "the public room of the hotel," located in the village of Otsego Lake, Michigan. That the parties were not hunting at the time of the shooting is clearly established by the following quotation from that opinion (p 32):

"He (defendant) had been hunting that day, and had loaded it (the gun) with cartridges. The fact that he believed that he had removed them all from the gun would not relieve him from responsibility in snapping it, when he knew it was pointed directly towards the plaintiff."

Also, by syllabus 1 in that case which reads:

"One who snaps a gun, knowing it to be pointed at another person, is guilty of negligence *per se,* and

is liable to such person in damages, both at the common law and under the statute (2 How Stat §§ 9110–9113) designed to prevent the careless use of firearms, for injuries occasioned by the discharge of the weapon; and it is no defense that he used the ordinary means to satisfy himself that the gun was unloaded, and believed it to be so when he snapped it off."

In *Bauer* this Court considered responsibility for a shot that was fired from a shooting gallery at a fair —a shot that struck a four and one-half year old boy who was walking down the midway with his mother.

Clearly, these two cases are not justification for giving the instruction complained about. They apply to those cases that come within the statute or common-law rule applicable to careless use of firearms, such as pointing guns at people, carelessly firing at targets, firing guns in the vicinity of people, *et cetera,* but are not applicable in the determination of negligence in hunting accident cases.

The California supreme court[3] was confronted with the exact question now presented to this Court, the sole difference being that in the California decision, "Plaintiffs contend that the trial court erred in failing to instruct the jury that 'One who causes injury to another by discharging a firearm must, in order to excuse himself from liability, show that he was absolutely without fault.'"

The California supreme court held that the trial court *did not err* in refusing to give the foregoing instruction; that the court was correct in instructing the jury that the test was negligence and that negligence is failure to use ordinary care, and that the proffered instruction improperly placed the burden of proof upon the defendant.

An instruction similar to the one we are here considering, namely, that defendant prove "that he was

3 *Jensen* v. *Minard,* 44 Cal 2d 325 (282 P2d 7).

completely without fault," was rejected by the West Virginia supreme court in a hunting accident case,[4] the court stating (p 115):

"At common law where one was injured by the discharge of a gun in the hands of another, the only defense available was that defendant was utterly without fault. The modern doctrine, however, has modified this rule, and places the liability upon negligence."

The court held that reasonable care should be the test, syllabus 1 reading:

"Reasonable care and negligence are relative terms, and the degree of care required of a sportsman using a firearm must be commensurate with the dangers to be avoided."

The West Virginia supreme court's conclusion is sustained by Prosser on Torts (2d ed), under "Unavoidable Accident," § 29, pp 118, 119, which calls attention to the "very strict responsibility" imposed by the "early common law" that:

"The defendant who fired a gun, and accidentally wounded the plaintiff, was held liable unless he could establish that the accident was inevitable—'judged utterly without his fault; as if a man by force take my hand and strike you—' and the burden was upon him to prove that such was the case,"

but that "the progress of the law has been away from this position" and that (p 119):

"In a few States, it has been said in gunshot cases that the burden is upon the defendant to show that he was free from negligence; but it is not clear that these cases mean to say more than that there is sufficient evidence of negligence in the occurrence of the accident itself to make out a prima facie case."

---

[4] *Koontz* v. *Whitney*, 109 W Va 114 (153 SE 797).

That the instruction in the instant case would not meet the test as applied in Wisconsin hunting cases is established in *Harper* v. *Holcomb,* 146 Wis 183 (130 NW 1128), by the following (p 191):

[Negligence is failure to exercise] "such care as is ordinarily exercised by the great mass of mankind under the same or similar circumstances. * * *

"True, what would be ordinary care under some circumstances would not be under others. * * * As the danger increases and the seriousness of injuries liable to occur from failure to avoid creating, or avoid meeting such danger, increases the *quantum* of care should increase and, *as matter of common knowledge, with the great mass of mankind does increase.* But while that is true there is, in circumstances of great danger, the same as in those of little peril, the three well known degrees of care. To say in either situation that one must exercise the very highest degree, in order to be free from failure to exercise ordinary care, would be palpably wrong. Where very much, as where very little, care is required there is the medium denominated ordinary care." (Emphasis ours.)

The New Hampshire supreme court[5] refused to agree with plaintiff that proof that defendant shot and injured plaintiff, mistaking him for a deer, established defendant's negligence, by stating:

"If the defendant told the truth, he did not fire without taking some precaution. * * * Whether the defendant's story was entitled to belief, and, if so, whether the precaution he took constituted reasonable care were plainly questions of fact."

In regard to contributory negligence, the court stated that the jury was entitled to consider the fact that plaintiff did not wear a special gunner's outfit comprising a red cap and checkered coat, but had on a pair of khaki pants and common cap and coat.

[5] *Webster* v. *Seavey,* 83 NH 60 (138 A 541, 53 ALR 1202).

The court emphasized the test should be whether the defendant hunter did what he should reasonably be required to do by reversing the jury verdict for defendant because the court failed to give the following instruction (p 63):

" 'One who goes gunning may not reasonably anticipate that a man in the woods will in fact be met, but by reason of the risk that one may be, he is called upon to do what is reasonably required to identify the object before he fires at it. One who hears a rustling and sees the bushes move may not reasonably anticipate that the cause of such rustle in and moving of the bushes is a man instead of a deer, but by reason of the risk that it may be a man instead of a deer, he is called upon to do what is reasonably required to find out.' "

A duck hunting accident case was considered by the Louisiana court of appeal.[6] The court rejected defendant's claim that in order to be held liable the proof must show that he was guilty of gross negligence, and stated that the only proof necessary was actionable negligence. The court defined actionable negligence as (p 916):

"It is so difficult as to be, for practical purposes, impossible to define the term *'actionable negligence'* in a thoroughly comprehensive and all-inclusive sense since the definition must inevitably depend upon surrounding circumstances. But, generally, we think that actionable negligence lies in the failure to exercise that degree of care which should be required of an ordinarily prudent person under the existing circumstances; 38 Am Jur, Negligence, § 2, p 643."

A similar ruling was made by the supreme court of Massachusetts[7] considering a hunting accident

---

[6] *Normand* v. *Normand* (La App), 65 S2d 914.
[7] *Adams* v. *Dunton*, 284 Mass 63 (187 NE 90).

where plaintiff and defendant were hunting ducks in a flat bottomed boat in a duck blind. In affirming judgment for plaintiff, the court stated (p 66):

"But the liability of one handling or controlling a loaded gun does not, as the defendant contends, depend upon gross negligence; it exists if there is a failure to use the care which would have been used by a person of reasonable prudence in all the attendant circumstances."

The Pennsylvania supreme court dealt with a case[8] "where two persons were out gunning, and one was walking in advance." Defendant, walking in the rear, accidentally shot and wounded plaintiff. The trial court instructed:

" 'If the injury which resulted, and as to which there is no controversy, is one which ordinary care and foresight might not have reasonably anticipated, the defendant is not liable in this action; if, on the other hand, from the nature of the instrument, the position of the parties, the situation as to the position of timber, bushes, or undergrowth, the position of the gun in its relation to the person injured, the defendant ought to have foreseen that there might be such an accident as this, if it was a suggestion of ordinary prudence and foresight that the plaintiff might be injured by the discharge of the defendant's gun, he would be responsible in damages for the negligence.' "

In approving the instruction and affirming judgment for plaintiff, the Pennsylvania court stated (p 608):

"Where the standard of duty is not fixed, but varies with the circumstances as developed by the testimony, the question of negligence is for the jury. No fixed standard could be applied to the facts of this case. It was for the jury, under proper

---

8 *Winans* v. *Randolph,* 169 Pa 606 (32 A 622).

instructions, to determine whether the defendant had exercised due care."

Unfortunately, the trial court erroneously decided that our decisions forced him to give the instruction he considered "too harsh." That instruction compelling defendant to prove he was without fault if the jury believed his gun shot plaintiff constituted reversible error, especially following the trial court's remark made during the examination of the jury that an injury such as plaintiff suffered could not have occurred but for somebody's fault.

A majority conclusion as to what constitutes negligence and due care in hunting accident cases is expressed in various ways in the cases referred to in this opinion, and we quote from same with the following summation:

*West Virginia*—"The degree of care required of a sportsman using a firearm must be commensurate with the dangers to be avoided."

*Louisiana*—"Actionable negligence lies in the failure to exercise that degree of care which should be required of an ordinarily prudent person under the existing circumstances."

*Pennsylvania*—"If the injury which resulted, and as to which there is no controversy, is one which ordinary care and foresight might not have reasonably anticipated, the defendant is not liable in this action."

*Massachusetts*—"Liability  *  *  *  exists if there is a failure to use the care which would have been used by a person of reasonable prudence in all the attendant circumstances."

*Wisconsin*—Negligence is failure to exercise "such care as is ordinarily exercised by the great mass of mankind under the same or similar circumstances."

This majority view of all the States is not in conflict with our recent decision *in re* negligence and due care,[9] and both will provide guidance in determining due care and negligence on retrial of this case and a guide to bench, bar, and sportsmen, in accident cases in the future.

The judgment should be reversed and the case remanded. Costs to appellant.

[9] *Frederick* v. *City of Detroit* (June, 1963), 370 Mich 425.