**In re AIR CRASH DISASTER AT DETROIT METROPOLITAN AIRPORT ON AUGUST 16, 1987.**

**Leo ATKINS, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., McDonnell Douglas Corporation, Defendants.**

**Ronald RHAN, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., McDonnell Douglas Corporation, Defendants.**

**MDL No. 742.**
**Civ. A. Nos. 88–CV–70337–DT, 88–CV–70338–DT.**

United States District Court, E.D. Michigan, S.D.

Oct. 10, 1989.

**410**

Charles Brewer, Phoenix, Ariz., Stanley Chesley, Cincinnati, Ohio, Lee Kreindler, New York City, Gerald Lear and Thomas Meehan, Washington, D.C., and Richard Schaden, Birmingham, Mich., for plaintiffs Steering Committee.

Carroll E. Dubuc, Laxalt, Washington, Perito and Dubuc, Washington, D.C., for defendant Northwest Airlines.

John J. Hennelly, Bryan, Cave, McPheeters & McRoberts, Los Angeles, Cal., and Donald E. Shely, Dykema Gossett, Detroit, Mich., for defendant McDonnell Douglas.

## ORDER

JULIAN ABELE COOK, Jr., Chief Judge.

Plaintiffs, Leo Atkins and Ronald Rhan, were employed by Guardian Guard Services, Inc. as security guards at the Detroit Metropolitan Airport on August 16, 1987.

While on duty that evening, they were immediately dispatched to the site of the crash after witnessing the crash of Northwest Flight 255 in order to secure the area from spectators, news media and the general public.

In subsequently filed Complaints, Atkins and Rhan allege that they were required to maintain their posts for over five hours, during which time their responsibilities included "the gathering and identification of bodies and body parts." *Atkins* Complaint, at 13; *Rhan* Complaint, at 14. They contend that these duties caused each of them to sustain psychological and emotional injuries (including trauma and depression), incur medical expenses for counseling and hospitalization, and suffer lost wages and the diminution of their respective earning capacities. *Atkins* Complaint, at 14; *Rhan* Complaint, at 14. In Counts I and II, Atkins and Rhan allege that the proximate cause of the accident which brought about their injuries was the negligence of Northwest Airlines (Northwest) and McDonnell Douglas Corporation (MDC), respectively.

On July 17, 1989, Northwest filed a Motion to Dismiss pursuant to *Fed.R.Civ.P.* 12(b),[1] arguing, in essence, that Michigan law does not allow recovery for safety officers for injuries "arising from the normal, inherent, and foreseeable risks of [their] chosen profession." On the same date, MDC filed a pleading, in which it joined in Northwest's Motion to Dismiss. The Court is now ready to decide the motion.

### I

Northwest relies upon *Kreski v. Modern Wholesale Electric Supply Company,* 429 Mich. 347, 358, 415 N.W.2d 178 (1987), in which the Supreme Courts of Michigan[2] adopted the fireman's rule that, in "its

---

**1.** *Fed.R.Civ.P.* 12(b) provides that if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." In response to this motion, the Plaintiffs attached copies of their Answers to Interrogatories. The Court will accordingly treat this motion as a Motion for Summary Judgment.

**2.** These cases were both filed in Michigan. The jurisdiction of this Court is based upon diversity of citizenship. Therefore, Michigan's choice of law rules must be applied. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties do not contest that Michigan substantive law is applicable in this case.

most basic formulation provides that a fire fighter or police officer may not recover damages from a private party for negligence in the creation of the reason for the safety officers presence." The Supreme Court reasoned that the rule:

> stem[s] from the nature of the service provided by fire fighters and police officers.... It is apparent that these officers are employed for the benefit of society in general, and for people involved in circumstances requiring their presence in particular....
>
> The public hires, trains, and compensates the fire fighters and police officers to deal with dangerous but inevitable situations ...
>
> 'The rule developed from the notion that taxpayers employ firemen and policemen, at least in part, to deal with future damages that may result from the taxpayer's own negligence. To allow actions by policemen and firemen against negligent taxpayers would subject them to multiple penalties for the protection.'

*Kreski v. Modern Electric, supra,* at 365–66, 415 N.W.2d 178, *quoting, Steelman v. Lind,* 97 Nev. 425, 427, 634 P.2d 666 (1981).

The *Kreski* Court continued and held that:

> [A]s a matter of public policy, firemen and police officers generally cannot recover for injuries attributable to the negligence that requires their assistance. This public policy is based on a relationship between firemen and policemen and the public that calls on these safety officers specifically to confront certain hazards on behalf of the public.

*Kreski, supra,* 429 Mich. at 367, 415 N.W.2d 178, *quoting Flowers v. Rock Creek Terrace,* 308 Md. 432, 447, 520 A.2d 361 (1987).

Subsequent to this opinion from the Michigan Supreme Court, the Michigan Court of Appeals, relying upon the reasoning in *Kreski,* decided *Kowalski v. Gratopp,* 177 Mich.App. 448, 442 N.W.2d 682 (1989), and held that the trial court had erroneously applied the "fireman's rule" to the plaintiff, who was an ambulance driver for a private company, Community EMS, which often performed calls for the City of Pontiac.[3]

The *Kowalski* Court, citing *Kreski,* found that "[a]pplication of the 'fireman's rule' is limited by its very nature to public employees. It is the public that hires, trains, and compensates fire fighters and police officers to confront danger. Basic to the public policy rationale underlying the fireman's rule is the spreading to the public of the costs of employing safety officers and of compensating them for any injuries they may sustain in the course of their employment." *Kowalski, supra,* at 450, 442 N.W.2d 682.

## II

■ Northwest argues that *Kowalski* is not applicable to this issue because (1) this Court is not bound by it, and (2) its reasoning is inconsistent with *Kreski.* As to Northwest's first argument, this Court notes that:

> [w]here a state's highest court has not spoken on a precise issue, a federal court, sitting in a diversity case, may not disregard a decision of the state appellate court on point, "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."

*Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1140 (6th Cir.1986), *quoting, Clutter v. Johns–Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir.1981); see also, *Pratt v. Brown Machine Company,* 855 F.2d 1225, 1238–1239 (6th Cir.1988). Thus, while this Court is not technically bound by the *Kowalski* ruling or reasoning, we may not disregard this decision unless there is persuasive data that the Michigan Supreme Court would rule otherwise.

Northwest, in contending that the *Kowalski* decision is inconsistent with *Kreski* and its citing, with approval of *Carter v.*

---

**3.** The call, which resulted in the plaintiff's injury, was not an emergency and Community EMS billed the patient directly.

*Mercury Theater Company,* 146 Mich.App. 165, 379 N.W.2d 409 (1985), posits that the Michigan Supreme Court will not limit the fireman's rule to public employees. *Carter* dismissed a private security guard's claim against a theater that had hired his employer for protection. The *Kreski* Court cited *Carter* in a footnote for the proposition that the primary assumption of risk is still a viable doctrine in Michigan, but did not rely upon its reasoning with regard to the analysis of the "fireman's rule." [4]

The *Carter* citation in *Kreski* does not persuade this Court that the Supreme Court of Michigan would apply the "fireman's rule" to private employees, such as Atkins and Rhan, under the circumstances of this case. Thus, this Court will adopt the reasoning of *Kowalski, supra,* and decline to extend the "fireman's rule" to private employees. *See, Kochins v. Linden-Alimak, Inc., supra,* at 1140.

### III

However, this Court feels compelled to consider the reasoning in *Carter, supra,* and *Turner v. Northwest General Hospital,* 97 Mich.App. 1, 293 N.W.2d 713 (1980), because the facts in those cases appear to be analogous to our case. In *Turner,* the defendant hospital hired a private security guard agency. The plaintiff, an employee of the agency, was shot and killed while guarding the hospital. The *Turner* Court stated:

> In this case, defendant hospital, recognizing a need to safeguard, protect and secure its patients, visitors, doctors and business invitees, hired an independent security guard company for that purpose. What happened to plaintiff's decedent was the very reason plaintiff's decedent and his employer were hired i.e., to safeguard against criminal acts of vio-

lence. It would be ironic to hold defendant hospital liable to an employee of the very security guard company it hired for protection.

*Turner, supra,* at 3-4, 293 N.W.2d 713. Based upon this reasoning, the Michigan Court of Appeals concluded that the defendant owed no duty to Turner and, therefore, could not be held liable for his death.

In *Carter,* the defendant, a theater owner, hired a security company, ACE Security Guard Service, to guard its property. On the night of the injury, plaintiff, an employee of ACE, evicted some patrons who had been disruptive. Those same patrons regained entrance, shot and paralyzed Carter. In his subsequently filed lawsuit against the property owner, he alleged that the patrons had regained entrance to the theater through a door with broken locks or by being readmitted by the defendant's employees who had been warned not to readmit him.

Even though Carter was not an employee of the theater owner, the Court did not allow him to recover based upon what appears to be an assumption of risk doctrine. Upon review, the State Court of Appeals dismissed the action for failure to state a claim, concluding that the defendant "owed no duty to plaintiff ... to warn and protect him from the injury and violence which occurred...." *Carter v. Mercury Theater Co., supra,* 146 Mich.App. at 167, 379 N.W.2d 409, *quoting, Turner v. Northwest General Hospital, supra.*

Although neither *Turner* nor *Carter* specifically spoke of assumption of risk, the underlying reasoning of the decisions indicates that the defendant *owed the plaintiff no duty* because the claimed injury grew out of the exact danger against which the plaintiff was hired to protect. This is the

---

**4.** *Kreski* explains that the doctrine of primary assumption of risk is restricted to those controversies between employer and employee. *Kreski, supra,* 429 Mich. at 363, 415 N.W.2d 178. The Court recognized that in *Carter,* the doctrine of assumption of risk was invoked to preclude a non-employee plaintiff, a private security guard, from recovering from the defendant theater owner who employed plaintiff's agency to protect the theater. While acknowledging

that the positions of private security guard and police officer were roughly analogous, the *Kreski* Court clearly determined that primary assumption of risk is not a basis for adopting the "fireman's rule." Thus, it concluded that a determination of "the exact requirements of primary assumption of risk" with respect to Kreski's employment status was not necessary for a resolution of the dispute. *Kreski, supra.*

same rationale behind the assumption of risk theory, that is:

> ... [it] is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases the acquiesence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to the cause of the injury, but ... no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers the risk of which he agreed expressly or impliedly to assume.

*Felgner v. Anderson,* 375 Mich. 23, 44, n. 4, 133 N.W.2d 136 (1965).

The assumption of risk doctrine then provides that an employee assumes the risks of injury from ordinary activities. Thus, if there is no duty owing to be breached, there is no recovery available. However, an employee does not assume the risk of those injuries which were caused by the negligent conduct of an employer. *Id.* at 43, 133 N.W.2d 136. In *Turner* and *Carter,* this doctrine was applied by the courts by determining whether the injury grew out of the very reason that the plaintiff was hired. *See, Turner, supra,* 97 Mich. App. at 3, 293 N.W.2d 713; *Carter, supra,* 146 Mich.App. at 167, 379 N.W.2d 409.

## IV

■ It is the finding of the Court that this theory as applied by the Michigan Courts in *Carter* and *Turner,* whether properly termed assumption of risk or not, precludes Atkins and Rhan from recovering in the present litigation. Although it appears that the assumption of risk doctrine requires the presence of an employer-employee relationship in order to preclude recovery, the *Carter* and *Turner* cases clearly establish that, under certain limited situations, a non-employee may be prevented from recovering if he/she is harmed by

performing the very duty for which he/she has been asked to perform.

In the present case, Atkins and Rhan were private security guards whose employment by Guardian Guard Service, Inc. included coverage of the Detroit Metropolitan Airport. On August 16, 1987, they were asked to assist the airport authorities in securing the crash site. (*Atkins* Complaint, at 10; *Rhan* Complaint, at 10, 13). In their respective Complaints, the Plaintiffs claim that their specific assignments immediately following the air crash included "the gathering and identification of bodies and body parts." (*Atkins* Complaint, at 13; *Rhan* Complaint, at 13). However, in their Answers to Interrogatories, they were asked to denote the "duties assigned to ... [and] performed by [them]." Atkins indicated that (1) he was assigned to "[c]heck and supervise approximately eight guards at their checkpoints" and (2) his duties included "crowd control to checkpoint number 3 which served as morgue to check I.D.'s of people transferring body parts ..." (*Atkins* Interrogatory No. 8). In Interrogatory No. 11, Atkins states that his injury resulted from the fact that he was "required to walk among the body parts and identify them...."

In his response to the interrogatories, Rhan indicated that his duties were to "block off traffic, give assistance at scene and remain at crash site to keep private citizens away." He also described his additional responsibilities on August 16, 1987 at the crash site as "mov[ing] private citizens away including news people." (*Rhan* Interrogatory No. 8).

The Court finds that the duties, which Atkins and Rhan performed, as deliniated in their Answers to Interrogatories, are precisely the duties that they were hired to perform. Duties such as crowd control, and checking identification are duties which they were hired to perform. Crowd control is an essential duty of any security guard. The Court is aware that the Plaintiffs performed their duties under very arduous and emotionally difficult conditions. The tasks which were performed by Atkins and Rhan, as described in their Answers to

Interrogatories, clearly fall within the very duties that they were hired to perform. Thus, any injury, resulting from performance of those duties, cannot result in liability to the Defendants.

Accordingly, the Motion to Dismiss, which has been filed by Northwest, must be granted.

IT IS SO ORDERED.